[No. S183411. Oct. 4, 2010.]

PROFESSIONAL ENGINEERS IN CALIFORNIA GOVERNMENT et al., Plaintiffs and Appellants, v.
ARNOLD SCHWARZENEGGER, as Governor, etc., et al., Defendants and Respondents;
JOHN CHIANG, as State Controller, etc., Defendant and Appellant.
CALIFORNIA ATTORNEYS, ADMINISTRATIVE LAW JUDGES AND HEARING OFFICERS IN STATE EMPLOYMENT, Plaintiff and Appellant, v.
ARNOLD SCHWARZENEGGER, as Governor, etc., et al., Defendants and Respondents;
JOHN CHIANG, as State Controller, etc., Defendant and Appellant.
SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 1000, Plaintiff and Appellant, v.
ARNOLD SCHWARZENEGGER, as Governor, etc., et al., Defendants and Respondents;
JOHN CHIANG, as State Controller, etc., Defendant and Appellant.

994

996

998

COUNSEL

Law Offices of Brooks Ellison and Patrick J. Whalen for Plaintiff and Appellant California Attorneys, Administrative Law Judges and Hearing Officers in State Employment.

Paul Harris and Anne M. Giese for Plaintiff and Appellant Service Employees International Union Local 1000.

Gerald A. James; Altshuler Berzon, Stephen P. Berzon and Danielle Leonard for Plaintiffs and Appellants Professional Engineers in California Government and California Association of Professional Scientists.

Reed Smith, Harvey L. Leiderman and Jeffrey R. Rieger for Teachers' Retirement Board of the California State Teachers' Retirement System as Amicus Curiae on behalf of Plaintiffs and Appellants.

Kelly Vent as Amicus Curiae on behalf of Plaintiffs and Appellants.

Richard J. Chivaro, Ronald V. Placet, Shawn D. Silva, Ana Maria Garza; Remcho, Johansen & Purcell, Robin B. Johansen and Margaret R. Prinzing for Defendant and Appellant.

K. William Curtis, Warren C. Stracener, Linda A. Mayhew, Will M. Yamada; Kronick Moskovitz Tiedemann & Girard, David W. Tyra, Kristianne T. Seargeant and Meredith H. Packer for Defendants and Respondents.

Edmund G. Brown, Jr., Attorney General, Gordon B. Burns, Deputy State Solicitor General, Jonathan K. Renner, Assistant Attorney General, James M. Humes, Stephen P. Acquisto and Mark R. Beckington, Deputy Attorneys General, for California Constitutional Officers as Amicus Curiae.

OPINION

GEORGE, C. J.—On December 1, 2008—faced with (1) a large current state budget deficit that was projected to grow to more than $40 billion by the

end of the 2009–2010 fiscal year, and (2) the very serious prospect that by as early as February 2009 the state would run out of cash to pay its ordinary expenses—the Governor of California declared a fiscal emergency, called the Legislature into special session, and submitted to the Legislature a comprehensive plan to address the budget problem. The Governor's budget plan included, among many other cost-saving features, two proposed statutory provisions that would direct the Department of Finance and the Department of Personnel Administration to implement, for the remainder of the 2008–2009 fiscal year and for the entire 2009–2010 fiscal year, a mandatory one-day-a-month unpaid furlough of most state employees employed by the executive branch, a proposal that would save the state approximately $37.5 million per month by reducing by approximately 5 percent the wages paid to each of the affected employees.

Two and one-half weeks later, on December 18, 2008, the Legislature passed its own proposed comprehensive budget legislation, comprising 15 separate budget-related bills. Among many other differences from the Governor's proposal, the Legislature's alternative plan did not include the Governor's recommended furlough provision.

On December 19, 2008, the Governor issued the executive order that lies at the heart of the present litigation, instructing the Department of Personnel Administration to implement, beginning on February 1, 2009, and continuing through June 30, 2010, a mandatory two-day-a-month unpaid furlough of most state workers employed in the executive branch.

Shortly after the Governor's issuance of this executive order, a number of employee organizations—the recognized, exclusive bargaining representatives of a majority of the workers employed by the State of California—filed three separate, but similar, lawsuits, contending that the Governor lacked authority to implement unilaterally an involuntary furlough of represented state employees that reduced such employees' hours and earnings by approximately 10 percent. The trial court, acting on an expedited basis, treated the three cases as related, heard argument in the cases together, and thereafter issued a single ruling rejecting the broad attacks made by the employee organizations on the executive order and concluding that the Governor possessed the authority to impose the furlough in response to the fiscal emergency facing the state.

The employee organizations (hereafter sometimes referred to as plaintiffs) appealed from the trial court's ruling. After briefing in the Court of Appeal was completed and the three cases were consolidated for purposes of oral argument and decision, but before the Court of Appeal set the matter for oral argument or issued a decision, we exercised our authority pursuant to article

VI, section 12, subdivision (a) of the California Constitution to transfer the consolidated matter to this court for oral argument and decision.

For the reasons explained below, we conclude that, under existing constitutional provisions and statutes, the Governor on December 19, 2008, possessed authority to institute a mandatory furlough of represented state employees, reducing the earnings of such employees, only if specifically granted such unilateral authority in an applicable memorandum of understanding entered into between the state and the employee organization representing the affected employees. Although there is considerable doubt whether the applicable memoranda of understanding granted the Governor such authority, we further conclude that even if the Governor lacked authority to institute the challenged furlough plan unilaterally, plaintiffs' challenge to the furlough plan now before us must be rejected. In mid-February 2009—shortly after the furlough program went into effect—the Legislature enacted, and the Governor signed, legislation that revised the Budget Act of 2008 (2008 Budget Act) by, among other means, reducing the appropriations for employee compensation contained in the original 2008 Budget Act by an amount that reflected the savings the Governor sought to obtain through the two-day-a-month furlough program. The February 2009 legislation further provided that the specified reduction in the appropriations for employee compensation could be achieved either through the collective bargaining process or through "existing administration authority." That phrase, in the context in which the revised budget act was adopted and in light of the provision's legislative history, reasonably included the furlough program that was then in existence and that had been authorized by the current gubernatorial administration. In particular, the bill analyses considered by the Legislature made specific reference to furlough-related reductions of employee compensation costs. Under these circumstances, we conclude that the Legislature's 2009 enactment of the revisions to the 2008 Budget Act operated to ratify the use of the two-day-a-month furlough program as a permissible means of achieving the reduction of state employee compensation mandated by the act.

Accordingly, we conclude that the 2009 budget legislation validated the Governor's furlough program here at issue, and reject plaintiffs' challenge to that program.

# I

The California Constitution provides that "[t]he Legislature shall pass the budget bill by midnight on June 15 of each year" (Cal. Const., art. IV, § 12, subd. (c)(3)), but, as we noted in *White v. Davis* (2003) 30 Cal.4th 528, 533 [133 Cal.Rptr.2d 648, 68 P.3d 74], "in recent years the timely adoption of the budget bill in California has proven to be the exception rather than the rule."

Enactment of the initial 2008 Budget Act was an unusually difficult and protracted task and, instead of being passed by June 15, 2008, the budget bill that year was not enacted by the Legislature and signed into law by the Governor until September 23, 2008.

Although the national and state economies already were in dire straits when the 2008 Budget Act finally was enacted, shortly thereafter the economy further deteriorated dramatically in light of the financial credit crisis and the resulting stock market collapse in October 2008 and a sharp decline in real estate values and consumer spending. In early November 2008, the Department of Finance reported that the state faced a revenue shortfall of $11.2 billion for the 2008–2009 fiscal year and a much higher budget deficit by the end of the 2009–2010 fiscal year, and further stated that "[i]f no action is taken to reduce spending, increase revenues, or a combination of both, the state will run out of cash in February and be unable to meet all of its obligations for the rest of the year." (Dept. of Finance, Rep., Governor's Budget, Special Session 2008–09, p. 1, <http://www.dof.ca.gov/budget/ historical/2009-10/documents/special_session_ 08-09_web.pdf> [as of Oct. 4, 2010].)

On November 6, 2008, the Governor published a letter addressed to all state employees, announcing that in order to cope with the state's worsening fiscal situation he would propose, among other spending reductions, a number of cuts related to state employees, including a one-day-a-month furlough of state employees that would result "in a pay cut of about 5 percent" but that would not "affect retirement and other benefits for which you are eligible." The letter declared that "[a]ll the actions we're proposing must first be approved by the Legislature."[1]

---

[1] The Governor's November 6, 2008, letter stated in relevant part:

"Dear Valued State Worker,

"During the six weeks since I signed our state budget, the mortgage crisis has deepened, unemployment has increased and the stock market has dropped significantly. As a result, we are facing a projected $11 billion revenue shortfall this fiscal year.

". . . I have called the Legislature into special session to address our fiscal emergency, and I am proposing a combination of economic stimulus measures, programs to keep Californians in their homes, revenue increases and spending reductions to address the real, immediate financial problems facing the state.

"*If approved by the Legislature*, these spending reductions will impact our state workers. . . .

"To achieve cost savings and protect vital state services, I am proposing the following measures:

"Furloughs: All state employees will be furloughed one day each month for the next year and half, a total of 19 days. This will result in a pay cut of about 5 percent. The pay cut will not affect retirement and other benefits for which you are eligible. [¶] . . . [¶]

"These changes will save the state roughly $1.4 billion over two years. I know these are not easy proposals, and I assure you we are working closely with union leadership to achieve

On that same day (Nov. 6, 2008), the Governor called the Legislature into special session and submitted a package of proposed legislative measures to address the state's fiscal problems.[2] The package included a proposal to add two new sections to the Government Code (proposed Gov. Code, §§ 19826.4, 19826.45), provisions that would require the Department of Finance and the Department of Personnel Administration (DPA) to implement a program for a one-day-a-month furlough of state employees for the remainder of the 2008–2009 fiscal year and for the entire 2009–2010 fiscal year.[3] The Legislature, which was in the final days of the 2007–2008 regular legislative session, did not act on the Governor's proposed budget legislation, and the legislative session ended on November 30, 2008. (Cal. Const., art. IV, § 3, subd. (a).)

On December 1, 2008, after the newly elected legislators took office and the 2009–2010 regular legislative session began (Cal. Const., art. IV, §§ 2, subd. (a), 3, subd. (a)), the Governor issued a proclamation declaring a fiscal emergency pursuant to the provisions of article IV, section 10, subdivision (f) of the California Constitution, and calling the Legislature into special session as provided by that constitutional provision. The Governor resubmitted to the Legislature the same comprehensive budget legislation that he had proposed the previous month, including the proposal to add specific provisions to the Government Code directing the implementation of a one-day-a-month furlough of state employees through the end of the 2009–2010 fiscal year. (See Assem. Budget Com., Summary of Governor's Proposed Dec. 2008–09 Budget Adjustments (Dec. 2, 2008) p. 14.)

The Legislature did not enact the Governor's proposed budget package but instead, on December 18, 2008, passed an alternative comprehensive budget package (comprising 15 separate budget-related bills). The Governor expressed immediate disapproval of the Legislature's action and subsequently (on Jan. 6, 2009) vetoed all 15 bills.[4]

---

results in the least painful way possible. *All the actions we're proposing must first be approved by the Legislature.*" (Italics added.)

[2] Although the special session proclamation specifically directed the Legislature to address the state's fiscal problems, the Governor did not declare a fiscal emergency under article IV, section 10, subdivision (f) of the California Constitution at that time.

[3] As initially proposed, the legislation directed that the furlough program would commence on December 1, 2008, and end on July 1, 2010, a period of 19 months, and would "not . . . exceed a total of 19 workdays. . . ."

The proposed legislation was submitted to the Legislature by the Department of Finance and was transmitted to the Office of Legislative Counsel in a request for draft legislation. That office formatted the proposals as draft legislation (RN [Request Number] 08 29145 and RN 08 29146), but the language proposed was not included in any bill that was formally introduced in the Legislature.

[4] Although the Legislature passed its alternative comprehensive budget legislation on December 18, 2008, that body did not immediately submit it to the Governor but held it

On December 19, 2008, the Governor issued the executive order here at issue. (Governor's Exec. Order No. S-16-08 (Dec. 19, 2008).) Citing the worsening financial crisis and the real possibility that the state would lack sufficient cash to meet its payroll and other obligations beginning in February 2009, and asserting that "in the December 1, 2008 fiscal emergency extraordinary session, the Legislature failed to effectively address the unprecedented statewide fiscal crisis," the executive order directed the DPA to adopt a plan—to be effective February 1, 2009, through June 30, 2010—"to implement a furlough of represented state employees and supervisors for *two days per month*, regardless of funding source" (italics added) and also "to implement an equivalent furlough or salary reduction for all state managers, including exempt state employees, regardless of funding source." (*Ibid.*) The order indicated that the furlough plan would include a limited exemption process. After the Governor issued his order, the DPA notified the certified bargaining representatives of represented state employees of the Governor's order and offered to meet and confer with them over the impact of the furloughs. Thereafter the DPA met with various bargaining units.

Shortly after the executive order in question was issued, a number of employee organizations—recognized bargaining representatives for the majority of represented state employees—filed three separate actions, challenging the validity of the Governor's executive order on a variety of grounds. On December 22, 2008, Professional Engineers in California Government and California Association of Professional Scientists filed a petition for writ of mandate in the Sacramento Superior Court (No. 34-2008-80000126), naming the Governor, the DPA, and the State Controller as defendants and seeking an order to restrain implementation of the executive order. On January 5, 2009, California Attorneys, Administrative Law Judges and Hearing Officers in State Employment (CASE) filed a similar petition in Sacramento Superior Court (No. 34-2009-80000134), and on January 7, 2009, Service Employees International Union Local 1000 (SEIU) also filed a similar petition in Sacramento Superior Court (No. 34-2009-80000135).

On January 9, 2009, the Director of the DPA sent a memo to all state departments indicating that the unpaid furlough program would be implemented by a general closing of state government operations on the first and third Friday of each month, beginning on February 6, 2009. For state operations that cannot close (such as prisons and hospitals), the memo indicated that agency heads could request approval from the DPA to use a "self-directed" furlough program for specific positions, under which employees either would choose two furlough days per month with the approval of

---

pending further negotiations with the Governor. After those negotiations broke down, the Legislature submitted the legislation to the Governor on January 6, 2009, and he immediately vetoed it.

their supervisors, or accrue two furlough days to be taken when feasible within two years following the conclusion of the furlough program. The memo further stated: "Salaries will be adjusted to reflect the unpaid furlough days, but benefits will remain the same (i.e., the furlough will not affect payouts for unused leave, service credit, health and retirement benefits, etc.)."[5] (DPA, State Employee Furlough per Governor's Executive Order S-16-08 (Jan. 9, 2009) <http://www.dpa.ca.gov/personnel-policies/furloughs/main.htm> [as of Oct. 4, 2010] (January 9, 2009 DPA Furlough Memo).)

Meanwhile, in the three pending Sacramento Superior Court actions, all parties stipulated to a briefing and hearing schedule that would permit the designated judge (Hon. Patrick Marlette) to hear the three cases together prior to February 1, 2009, the date on which the furlough program was scheduled to begin. On January 29, 2009, the trial court conducted a single hearing in all three cases, and on January 30 the court issued a single ruling denying all three petitions on the merits and ordering the State Controller (Controller) to comply with the executive order in the course of issuing pay warrants to the affected state employees. Thereafter, on February 11, 2009, the court entered a formal judgment denying the petitions.

Plaintiffs and the Controller filed timely appeals in the Court of Appeal in all three cases. On February 2, 2009, SEIU filed a petition for a writ of supersedeas in the Court of Appeal, requesting that the appellate court stay implementation of the furlough program pending appeal. The appellate court denied the petition for supersedeas on February 27, 2009, and the Controller implemented the furlough order during the pendency of this appeal insofar as the order applied to the employees represented by plaintiff employee organizations.

Meanwhile, the Controller had sent a letter to the trial court on February 3, 2009, requesting that it clarify whether its January 30 ruling applied to persons employed in offices headed by independently elected constitutional officers (such as the Attorney General and the Controller). In response, the trial court, on February 4, 2009, issued an order stating that no issue regarding application of the executive order to employees of independently elected constitutional officers had been raised or litigated in the writ matters on which the court had ruled, and indicating that its ruling expressed no view regarding that issue. The Controller subsequently informed the Governor that, in issuing salary warrants, he (the Controller) would not implement furloughs

---

[5] The January 9, 2009 DPA Furlough Memo also noted that "[t]he state continues to meet with representatives for state employees about the impact of this program and will notify you of any further developments." (Boldface & italics omitted.)

for the employees of the state's independently elected constitutional officers without a court order directing him to do so.

On February 9, 2009, the Governor filed a petition for a writ of mandate in Sacramento Superior Court against the Controller, requesting an order compelling the Controller to implement furloughs for the independently elected constitutional officers. (*Schwarzenegger v. Chiang* (No. 34-2009-80000158).) On March 12, 2009, the trial court ruled that the Controller must implement the Governor's furlough order with respect to employees who work for independently elected constitutional officers. The Controller appealed from that ruling, and the trial court's order in that matter has been stayed by the appeal, which is currently pending in the Court of Appeal, Third Appellate District (C061648).[6]

On February 19, 2009, after extended discussion and negotiation, the Legislature passed, and on February 20, 2009, the Governor signed, Senate Bill No. 2 (2009–2010 3d Ex. Sess.) (Senate Bill 3X 2), which revised the 2008 Budget Act in response to the fiscal emergency. (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 2 (sometimes hereafter revised 2008 Budget Act).) Section 36 of Senate Bill 3X 2 added section 3.90 to the original 2008 Budget Act (Stats. 2008, ch. 268). Section 3.90, subdivision (a) provides in part: "Notwithstanding any other provision of this act, each item of appropriation in this act . . . shall be reduced, as appropriate, to reflect a reduction in employee compensation achieved through the collective bargaining process for represented employees or through existing administration authority and a proportionate reduction for nonrepresented employees (utilizing existing authority of the administration to adjust compensation for nonrepresented employees) in the total amounts of $385,762,000 from General Fund items and $285,196,000 from items relating to other funds." As discussed below (*post*, at pp. 1043–1048), the amount of the reduction in appropriations for employee compensation set forth in section 3.90 reflected, among other proposed reductions, the reductions that the Governor proposed to achieve

---

[6] Numerous additional lawsuits were filed challenging the validity of the December 19, 2008, furlough order as applied to the employees of particular agencies or entities. One such action, pertaining to the validity of the furlough as applied to the employees of the State Compensation Insurance Fund, resulted in a published Court of Appeal decision affirming a trial court ruling that the furlough order could not validly be applied to such employees in light of the provisions of Insurance Code section 11873. (*California Attorneys, etc. v. Schwarzenegger* (2010) 182 Cal.App.4th 1424 [106 Cal.Rptr.3d 702], review granted May 19, 2010, S182581.) We granted review in *California Attorneys, etc.* on May 19, 2010, and that matter is pending before us. Because the resolution of that matter may be affected by our decision in the present case, we have deferred further action in the *California Attorneys, etc.* matter pending the finality of the present opinion.

through the two-day-a-month furlough of state employees.[7] Section 3.90, subdivision (a) also indicated the Legislature's intent to make similar reductions in employee compensation for the 2009–2010 fiscal year.[8]

On the same date (Feb. 19, 2009) the Legislature enacted legislation amending the 2008 Budget Act (revising the budget for the 2008–2009 fiscal year), it also passed the initial version of the Budget Act of 2009 (Sen. Bill No. 1 (2009–2010 3d Ex. Sess.) (Senate Bill 3X 1), enacted as Stats. 2009, 3d Ex Sess. 2009–2010, ch. 1), which set forth the budget for the 2009–2010 fiscal year (2009 Budget Act). The 2009 Budget Act included the reduced appropriations for state employee compensation proposed by the Governor, which reflected the savings generated by the two-day-a-month furlough plan, and included language in section 3.90 of that act identical to language in the revised 2008 Budget Act, indicating that the reductions in employee compensation are to be achieved "through the collective bargaining process for represented employees or through existing administration authority and a proportionate reduction for nonrepresented employees (utilizing existing authority of the administration to adjust compensation for nonrepresented employees) . . . ." (Sen. Bill 3X 1, § 3.90, subd. (a), p. 633.)

The revised 2008 Budget Act and the initial 2009 Budget Act were signed into law on February 20, 2009, as part of a comprehensive budget package that included a number of proposed constitutional amendments that were to be put before the voters at a special election to be held shortly thereafter.[9] At that special election, held on May 19, 2009, the voters rejected most of the ballot propositions that were part of the budget package.

---

[7] In addition to the reductions in the appropriations for employee compensation that were attributable to furloughs, the reductions specified in section 3.90 also reflected the elimination of two state holidays and a revision of the method of calculating overtime—two other cost-saving measures proposed by the Governor but not imposed by the December 19, 2008, executive order. (See, *post*, at pp. 1046–1047.)

[8] A controversy exists concerning the interpretation of the language in the revised 2008 Budget Act that states the reduction in employee compensation is to be achieved "through the collective bargaining process for represented employees or through existing administration authority and a proportionate reduction for nonrepresented employees (utilizing existing authority of the administration to adjust compensation for nonrepresented employees)." (Sen. Bill 3X 2, § 36, p. 31.) We explore that issue later in this opinion. (*Post*, at pp. 1043–1048.)

[9] The Official Voter Information Guide for the May 19, 2009, Special Election contains a helpful overview (prepared by the Legislative Analyst's Office) of the then current state budget problems and the resolution proposed by the February 2009 legislation. (Voter Information Guide, Special Elec. (May 19, 2009) overview of the state budget, pp. 8–9 (May 2009 Voter Guide).)

The Legislative Analyst's overview states:

"*Recent State Budget Problems.* In recent years, state government has experienced major budgetary problems with the General Fund. The state's budget problems have been due to a variety of factors—including large ups and downs in state revenues and the use of one-time solutions to support higher ongoing spending. In late 2008, the state's budget problems got

After the May 19, 2009, election, the state's fiscal crisis continued to worsen. On July 1, 2009, the Governor issued another executive order, instituting a third unpaid furlough day each month for state employees, to run from July 1, 2009, to June 30, 2010. (Governor's Exec. Order No. S-13-09 (July 1, 2009).)

On July 24, 2009, the Legislature passed Assembly Bill No. 4X 1 (2009–2010 4th Ex. Sess.) (Assembly Bill 4X 1), which revised the 2009 Budget Act. (Stats. 2009, 4th Ex. Sess. 2009–2010, ch. 1.) As enacted by the Legislature, Assembly Bill 4X 1 further reduced the appropriations for employee compensation and retained the same language regarding the manner in which the reductions were to be achieved as appeared in the revised 2008 Budget Act and the initial 2009 Budget Act. (Assem. Bill 4X 1, § 552 [amending § 3.90 of the 2009 Budget Act].) The Governor signed this bill into law on July 28, 2009. The present litigation does not involve the validity of the third furlough day that was in effect from July 1, 2009, to June 30, 2010.

The two-day-a-month furlough plan that began on February 1, 2009, and the subsequent three-day-a-month furlough plan that began on July 1, 2009, both terminated on June 30, 2010.

On July 28, 2010—a budget act for the 2010–2011 fiscal year not having been timely enacted and the state's serious budget problems continuing

---

even worse as a result of the financial credit market crisis and the national recession. By January 2009, it was projected that the state would face a $40 billion shortfall over 2008–09 and 2009–10 if no corrective actions were taken.

"*February 2009 Budget Solutions.* In response, in February 2009, the Legislature and the Governor agreed on a budget package to bring the 2008–09 and 2009–10 budgets back into balance. With these changes, the state expects in 2009–10 to bring in about $98 billion in revenues and spend about $92 billion. (The difference of about $6 billion between revenues and spending is being used to cover a year-end deficit in 2008–09 and build up a reserve account.) This package included more than $40 billion in solutions.

"*Spending Reductions.* The package included about $15 billion in spending-related reductions. The largest reductions related to kindergarten through twelfth grade schools, which experienced both reductions to core program funding and the deferral of payments to future years. *Reductions also included furloughing state workers,* eliminating inflationary adjustments for many programs, and making other reductions in services.

"*Tax increases.* The package included about $12.5 billion in tax increases. Most of these higher taxes are the result of increased rates for the sales and use tax, vehicle license fee, and personal income tax.

"*Federal Funds.* The package also assumed receipt of more than $8 billion in federal funds from the recent economic stimulus law to help balance the budget.

"*Borrowing.* Finally, the package counted on $5 billion from the borrowing of future lottery profits.

"*Budget-Related Propositions.* As part of the February package, six propositions were placed on this ballot related to the budget. . . ." (May 2009 Voter Guide, *supra*, at pp. 8–9, italics added.)

unabated—the Governor issued a new executive order, directing the DPA to implement a three-day-a-month furlough plan to begin on August 1, 2010, and to continue until "a 2010–11 fiscal year budget is in place and the Director of the Department of Finance determines that there is sufficient cash to allow the State to meet its obligations to pay for critical and essential services to protect public health and safety and to meet its payment obligations protected by the California Constitution and federal law." (Governor's Exec. Order No. S-12-10 (July 28, 2010) p. 2.) Prior to the first furlough day scheduled under the newly promulgated furlough plan, numerous employee organizations filed lawsuits in the Alameda Superior Court challenging the validity of the Governor's July 28, 2010, order. (*Professional Engineers in California Government v. Schwarzenegger* (No. RG1049800) and consolidated cases.) On August 9, 2010, a judge of the Alameda Superior Court issued a temporary restraining order enjoining the Governor and other state officials from implementing the new executive order pending a hearing on the employee organizations' request for a preliminary injunction. The Governor immediately appealed to the Court of Appeal from the trial court's ruling issuing the temporary restraining order, and sought a writ of supersedeas to stay the trial court's order pending resolution of the appeal. After the Court of Appeal denied the stay, the Governor sought immediate review in this court. On August 18, 2010, we granted the petition for review in that matter, deferred further action pending our resolution of the current proceeding, and stayed further superior court proceedings in that matter as well as the temporary restraining order that had been issued on August 9, 2010. The current proceeding does not involve the validity of the Governor's July 28, 2010, executive order.

## II

We now describe in somewhat greater detail the proceedings below.

In each of the three Sacramento Superior Court cases, the petition filed by the employee organization sought (1) the issuance of a writ of mandate directing the Controller and the Governor not to implement the mandatory two-day-a-month unpaid furlough instituted by the Governor's December 19, 2008, executive order, and (2) a declaratory judgment stating that the executive order was invalid. The principal contention advanced in all three cases is that the Governor lacks authority to impose a mandatory unpaid furlough *unilaterally*—reducing the wages of the employees represented by the plaintiff employee organizations—and that such a measure may be adopted only by the Legislature. Each petition asked the trial court to act expeditiously, before February 1, 2009, when the furloughs were scheduled to go into effect.

The Governor and the DPA initially filed a demurrer to the petitions, arguing that the actions first should have been brought before the Public Employment Relations Board (PERB), and thereafter they filed an opposition to the petitions on the merits, relying (at that juncture) primarily on the contention that Government Code section 3516.5 provided the Governor with the authority to implement the furlough program in a fiscal emergency.[10]

In contrast to the Governor and the DPA, the Controller, who also had been named as a defendant in each of the petitions, filed an answer concurring in plaintiffs' challenge to the Governor's executive order. Like plaintiffs, the Controller maintained that the Governor lacks authority to reduce state employees' pay unilaterally through a mandatory furlough, arguing that only the Legislature possesses such authority.

The trial court considered the matter on an expedited basis and, after conducting a single hearing, issued a ruling applicable to all three cases. In its ruling, the court first overruled the demurrer to the petitions, concluding that the superior court properly could exercise jurisdiction over the actions. Turning to the merits, the court then rejected plaintiffs' claim that the Governor and the DPA lacked authority to institute the challenged furlough plan. In reaching its conclusion on the merits, the trial court relied primarily upon its interpretation of sections 19851 (a provision concerning workweek hours) and 19849 (a provision granting the DPA general authority to issue regulations "governing hours of work and overtime compensation"), as well as its determination that the applicable memoranda of understanding (MOU's) between the employee organizations in question and the state authorized the Governor and the DPA to take such action in a fiscal emergency. As part of its ruling, the trial court explicitly ordered the Controller to comply with the Governor's furlough order.[11]

Plaintiffs and the Controller filed timely appeals in the Court of Appeal. After the regular rounds of briefing were completed, that court issued an order consolidating the three cases for oral argument and decision, and shortly thereafter directed the parties to file supplemental briefs addressing a series of detailed questions. After the rounds of supplemental briefing were completed, but before the Court of Appeal was prepared to set the consolidated matter for oral argument or issue a decision, we transferred the matter

---

[10] Unless otherwise noted, all further statutory references are to the Government Code.

[11] In the course of its decision, the trial court noted that, at the hearing, counsel for SEIU had raised the claim that the Governor's order amounted to an unconstitutional impairment of contract. Because this impairment-of-contract claim had not been raised in any of the petitions, the trial court declined to rule on that claim. In the briefs filed in this court, a number of plaintiffs also advance an unconstitutional-impairment-of-contract claim, but because the impairment-of-contract issue was not raised in any of the petitions and was not ruled upon by the trial court, we conclude the issue is not properly before us.

to this court (Cal. Const., art. VI, § 12, subd. (a)), requested further supplemental briefing on two additional issues,[12] and held oral argument on September 8, 2010.

## III

We begin with a brief overview of the general provisions of the California Constitution and the California statutes relating to state finances and the state budget.

■ Under the California Constitution, the Legislature and the Governor share responsibility for the state's finances and its budgeting process. The Governor is assigned the responsibility of submitting to the Legislature each year in early January a proposed balanced budget for the upcoming fiscal year (which runs from July 1 to June 30). (See Cal. Const., art. IV, § 12, subd. (a) ["[w]ithin the first 10 days of each calendar year . . ."].) The Legislature considers the proposed budget, engages in negotiations among its members and with the Governor, and is obligated to pass a budget bill for the upcoming fiscal year "by midnight on June 15 of each year." (Cal. Const., art. IV, § 12, subd. (c)(3).) The Constitution further provides that the Legislature may not send to the Governor for consideration, and the Governor may not sign into law, a budget bill that does not provide for a balanced budget. (Cal. Const., art. IV, § 12, subd. (f).) After the Legislature acts, the Governor is authorized to reduce or eliminate one or more specific items of appropriation through exercise of the "line-item veto," and those gubernatorial reductions take effect unless the Legislature by a two-thirds vote overrides the Governor's veto regarding a specific item. (Cal. Const., art. IV, § 10, subd. (e).) The Constitution also specifies that the Controller, in approving payments from the state treasury, is authorized to make only those expenditures for which there is an available appropriation. (Cal. Const., art. XVI, § 7.)

The Constitution further provides that "[t]he Legislature may control the submission, approval, and enforcement of budgets and the filing of claims for

---

[12] We requested supplemental briefing addressing the following questions:

"1. What effect, if any, does Government Code section 19996.22—which provides in part that '[a]ny employee . . . who has been required, by the appointing power, . . . to involuntarily reduce his or her worktime contrary to the intent of this article . . . may file a grievance with the department'—have on the validity of the Governor's December 19, 2008, executive order instituting a mandatory furlough on state employees?

"2. What effect, if any, does the provision of the revised 2008 Budget Act that reduced the appropriations for employee compensation for the 2008–09 fiscal year in an amount comparable to the savings sought to be achieved by the Governor's furlough order (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 2, § 36 (Sen. Bill 3X 2, § 36), passed by the Legislature and approved by the Governor on Feb. 20, 2009) have on (1) the validity of the Governor's executive order, and/or (2) the remedy, if any, to which the petitioning employee organizations may be entitled in these actions?"

all state agencies." (Cal. Const., art. IV, § 12, subd. (e).) The Legislature has adopted statutes authorizing the Department of Finance to exercise general supervisory authority over the state's financial and business policies, including obtaining the necessary information to monitor expenditures and revenues during the fiscal year. (§§ 13070, 13320, 13337.) In addition, section 13337.5 provides that "[t]he annual Budget Act shall not provide for projected expenditures in excess of projected revenues" and further that "it is the intention of the Legislature that in the event, after enactment of the Budget Act, revised estimates of expected revenues or expenditures, or both, show that expenditures will exceed estimated revenues, expenditures should be reduced or revenues increased, or both, to ensure that actual expenditures do not exceed actual revenues for that fiscal year."

Until 2004, however, there was no specific provision establishing a procedure for dealing with a situation in which, in the course of a fiscal year, it became apparent that the expenditures originally anticipated and authorized under the existing budget substantially would exceed the estimated revenues that the state would obtain during the fiscal year.

In the primary election held on March 2, 2004, a ballot measure was put before the voters that directly addressed the type of midyear fiscal emergency that led to the executive order challenged in the present case. That measure, appearing on the ballot as Proposition 58, proposed adding a new provision—article IV, section 10, subdivision (f) (hereafter article IV, section 10(f))—to the California Constitution. The voters approved the measure at that election, adding the provision to our state Constitution.

■ Under article IV, section 10(f), if the Governor determines in the midst of a fiscal year that there is likely to be a substantial unanticipated budget deficit for that fiscal year, he or she may declare a fiscal emergency, call a special legislative session to deal with the emergency, and submit proposed legislation to address the problem. The provision also specifies that if the Legislature fails to enact legislation within 45 days to address the fiscal emergency, the Legislature may not act on any other bill and cannot recess until it passes such legislation.[13]

---

[13] Article IV, section 10(f) provides in full:

"(1) If, following the enactment of the budget bill for the 2004–05 fiscal year or any subsequent fiscal year, the Governor determines that, for that fiscal year, General Fund revenues will decline substantially below the estimate of General Fund revenues upon which the budget bill for that fiscal year, as enacted, was based, or General Fund expenditures will increase substantially above that estimate of General Fund revenues, or both, the Governor may issue a proclamation declaring a fiscal emergency and shall thereupon cause the

In the present case, on December 1, 2008, the Governor invoked the provisions of article IV, section 10(f), called a special session, and submitted proposed legislation. The Legislature did not enact the Governor's proposed legislation but instead passed an alternative budget package on December 18, 2008—legislation that the Governor ultimately vetoed on January 6, 2009.

On December 19, 2008, citing a worsening fiscal situation and maintaining that during the fiscal emergency special session "the Legislature failed to effectively address the unprecedented statewide fiscal crisis," the Governor issued the executive order at issue in this case, directing implementation of a two-day-a-month unpaid furlough of state workers employed in the executive branch, to begin on February 1, 2009, and run through June 30, 2010. Thereafter, on February 19, 2009, the Legislature adopted, and on February 20, 2009, the Governor signed, a revised 2008 Budget Act (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 2) and an initial 2009 Budget Act (*id.*, ch. 1), which reduced the appropriations for state employee compensation to a level proposed by the Governor—a level that included reductions attributable to the furlough program.

In light of this chronology, we believe it is useful to analyze the issues presented in this case by posing two broad questions. First, on December 19, 2008, did the Governor possess authority to impose unilaterally a mandatory two-day-a-month unpaid furlough for state employees by issuing an executive order? Second, did the Legislature's enactment in February 2009 of the revised 2008 Budget Act and the initial 2009 Budget Act affect the validity of the Governor's executive order or the remedy that the employee organizations may be entitled to obtain in the present proceeding? We begin our analysis with the first of these two questions.

## IV

Plaintiffs contend the Governor lacked the authority to impose unilaterally, through his December 19, 2008, executive order, a mandatory unpaid furlough on state workers. Plaintiffs maintain it was well understood at the time

---

Legislature to assemble in special session for this purpose. The proclamation shall identify the nature of the fiscal emergency and shall be submitted by the Governor to the Legislature, accompanied by proposed legislation to address the fiscal emergency.

"(2) If the Legislature fails to pass and send to the Governor a bill or bills to address the fiscal emergency by the 45th day following the issuance of the proclamation, the Legislature may not act on any other bill, nor may the Legislature adjourn for a joint recess, until that bill or those bills have been passed and sent to the Governor.

"(3) A bill addressing the fiscal emergency declared pursuant to this section shall contain a statement to that effect."

the Governor issued this executive order that such action could be undertaken only by, or with the concurrence of, the Legislature.

## A

Plaintiffs first point to article IV, section 10(f), noting that this provision clearly contemplates that, in the event of a midyear fiscal emergency, the Governor can propose remedial measures, but that such proposals will take effect only if adopted by the Legislature and signed into law. Plaintiffs emphasize in this regard that resolution of a serious budget problem invariably implicates a myriad of fundamental policy decisions and tradeoffs, and they maintain that article IV, section 10(f) accurately recognizes that under the traditional separation-of-powers principles embodied in the California Constitution (art. III, § 3) it is for the Legislature to fashion an appropriate solution to a fiscal emergency through the passage of legislation—legislation that is then subject to the Governor's veto authority.

It is true that article IV, section 10(f) was proposed and adopted in 2004 in response to a perceived need for a new procedure to deal with midyear fiscal emergencies, and that this provision recognizes that ordinarily the Governor will be unable to solve the problem alone and that a solution to such a fiscal emergency generally will require the Legislature's enactment of new legislation. The circumstance that article IV, section 10(f) recognizes that the Legislature ordinarily will play a key role in resolving a midyear state budget crisis, however, does not signify that the Governor lacks authority to undertake *any* unilateral actions to conserve funds and cut state expenditures in response to a fiscal emergency. No one argues, for example, that, in response to a midyear fiscal emergency, the Governor could not delay discretionary spending on public works projects or could not (at least with regard to those executive employees under his direct control) freeze hiring (leaving unfilled those vacant positions for which funds had been appropriated). In the present case the Governor essentially is arguing that instituting a mandatory unpaid furlough of state employees, similar to not filling vacancies, is one of the measures that he lawfully could institute *unilaterally*.

## B

Plaintiffs respond that there is clear and abundant evidence that, prior to the Governor's issuance of the initial furlough order on December 19, 2008, it was well understood that a mandatory furlough of state employees (encompassing a cut in employee wages) could *not* be imposed by the Governor *unilaterally*. Initially, plaintiffs point out that the Governor himself, in his November 6, 2008, letter to state employees, explicitly recognized the need for legislative concurrence when he first announced his intention to propose a

one-day-a-month unpaid furlough of state employees to deal with the state's fiscal crisis. Moreover, plaintiffs also note that in the comprehensive budget legislation submitted by the Governor to the Legislature on November 6, 2008, he proposed that it adopt new statutory provisions that would direct the Department of Finance and the DPA to implement such a furlough. Further, plaintiffs observe that when, on December 1, 2008, the Governor formally declared a fiscal emergency pursuant to article IV, section 10(f) and called a special session of the Legislature to address that emergency, he again submitted a comprehensive budget proposal that included the same statutory provisions by which the Legislature would mandate the implementation of the furlough program. Plaintiffs maintain that all of these actions constituted an unambiguous acknowledgement on the part of the Governor that legislative action was required before a furlough could be imposed. Finally, plaintiffs point out that the present Governor is not the first California governor to recognize that, under existing California law, the Governor lacks the authority unilaterally to reduce state employee earnings even in a fiscal emergency. Plaintiffs note that in the early 1990's, in response to a similar state fiscal emergency, Governor Wilson had proposed a ballot measure that would have afforded the Governor of California at least some unilateral authority to act in this area—a measure that failed to win the support of a majority of the voters at the November 1992 election.[14]

Of course, neither the position taken by the Governor in his November 6, 2008, letter to state employees, nor his proposal that the Legislature adopt provisions directing the implementation of a furlough, constitutes a legally controlling determination that the Governor lacks authority to impose such a furlough unilaterally. In defending his December 19, 2008, executive order in the present litigation, the Governor, noting the absence of any definitive judicial ruling, advances a number of grounds to support his claim that he possesses the unilateral authority to impose such a mandatory furlough.

---

[14] The 1992 initiative measure—the Government Accountability and Taxpayer Protection Act of 1992 (GATPA)—addressed a number of perceived structural problems in the state-budget process. The measure, which appeared on the November 1992 ballot as Proposition 165, would have authorized the Governor to declare a midyear fiscal emergency "whenever at the end of any fiscal quarter revenues are 3 percent less than forecast, expenses are 3 percent more than forecast, or revenues are 1 1/2 percent less *and* expenses are 1 1/2 percent more than forecast." (*League of Women Voters v. Eu* (1992) 7 Cal.App.4th 649, 653–654 [9 Cal.Rptr.2d 416] [describing Prop. 165].) In addition to authorizing the Governor to reduce other expenses unilaterally during a fiscal emergency, the measure provided that "[d]uring a state of fiscal emergency, the Governor would be empowered to reduce salaries of state employees not covered by a collective bargaining agreement by up to 5 percent or impose equivalent furloughs. (GATPA, § 5.)" (*Id.* at p. 654.) As noted above, the voters rejected Proposition 165 at the November 1992 election.

## C

The Governor initially maintains that his authority to institute unilaterally the challenged furlough program derives from the broad language of article V, section 1 of the California Constitution, which provides in full: "The supreme executive power of this State is vested in the Governor. The Governor shall see that the law is faithfully executed." The Governor contends the power to furlough state employees in the face of a fiscal emergency is an inherent part of his constitutional authority as the state's chief executive.

In advancing this argument, however, the Governor fails to cite any judicial decision or other supporting authority holding or suggesting that the power under the California Constitution to establish or revise the terms and conditions of state employment, even in a fiscal emergency, resides in the Governor (or any other executive officer or entity) rather than in the Legislature. To the contrary, the following is well established: (1) Under the California Constitution it is *the Legislature*, rather than the Governor, that generally possesses the ultimate authority to establish or revise the terms and conditions of state employment through legislative enactments, and (2) any authority that the Governor or an executive branch entity (such as the DPA) is entitled to exercise in this area emanates from the Legislature's delegation of a portion of its legislative authority to such executive officials or entities through statutory enactments. (See, e.g., *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 181–196 [172 Cal.Rptr. 487, 624 P.2d 1215]; *State Trial Attorneys' Assn. v. State of California* (1976) 63 Cal.App.3d 298, 303 [133 Cal.Rptr. 712]; accord, *Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 31–42 [30 Cal.Rptr.3d 30, 113 P.3d 1062] [under the Cal. Const., the Legislature, not the Governor, possesses general authority to appoint executive officers].)[15] As this court explained in *Pacific Legal Foundation v. Brown, supra,* 29 Cal.3d 168, 188: "[T]he . . . authority to set

---

[15] A limitation on the Legislature's constitutional authority over the terms and conditions of state employment is imposed by the civil service provisions of article VII, sections 1 through 4, of the California Constitution, which grant the State Personnel Board the authority to enforce and administer the directives of the civil service statutes. (See *State Personnel Bd. v. Department of Personnel Admin.* (2005) 37 Cal.4th 512 [36 Cal.Rptr.3d 142, 123 P.3d 169].) This court's decision in *Pacific Legal Foundation v. Brown, supra,* 29 Cal.3d 168, explains, however, that the Legislature, rather than the State Personnel Board (or, now, the DPA), possesses the ultimate authority over all of the terms and conditions of employment other than those relating to the civil service " 'merit principle,' " including terms and conditions relating to the wages and hours of state employees. (*Id.* at pp. 181–193.) Quoting from the ballot argument supporting the measure that added the civil service provision to the California Constitution in 1934, in *Pacific Legal Foundation v. Brown* we observed: "Having established [the] 'merit principle' as a matter of constitutional law, and having established a nonpartisan Personnel Board to administer this merit principle, *the constitutional provision left the Legislature with a 'free hand' to fashion 'laws relating to personnel administration for the best interests of the State.' * " (*Pacific Legal Foundation,* at p. 184, fn. omitted, italics added.)

salaries [of public employees] has traditionally been viewed as a legislative function, with ultimate authority residing in the legislative body." Furthermore, as we discuss in the next part of this opinion, it is similarly well established that the foregoing general principle applies equally in a fiscal emergency. Accordingly, the Governor's authority to issue the December 19, 2008, furlough order cannot be supported simply by reference to the broad language of article V, section 1 of the Constitution.

### D

The Governor alternatively contends that his authority to institute the state employee furlough program arises from a number of statutory provisions, maintaining in this regard that there is no judicial decision in point holding the Governor is not statutorily authorized to impose such a furlough program, particularly in the context of a fiscal emergency. Although there is no California case precisely in point, two Court of Appeal decisions that arose out of a state fiscal emergency comparable to the circumstances that engendered the executive order in the present case—*Department of Personnel Administration v. Superior Court (Greene)* (1992) 5 Cal.App.4th 155 [6 Cal.Rptr.2d 714] (*Greene*) and *Tirapelle v. Davis* (1993) 20 Cal.App.4th 1317 [26 Cal.Rptr.2d 666] (*Tirapelle*)—provide considerable guidance regarding the issues now before us. As we shall see, the decision in *Greene* dealt with proposed changes to the terms and conditions of employment of *represented employees* (that is, those state employees who are covered by the Ralph C. Dills Act (§§ 3512–3524 (hereafter the Dills Act))[16] and who have chosen an exclusive representative to appear on their behalf in negotiations with the state), whereas the decision in *Tirapelle* concerned proposed changes affecting *nonrepresented employees* (that is, all other state employees). Because of the relevance of these two decisions, we believe it is useful to review them in some detail before addressing the specific statutory provisions relied upon by the Governor.

### 1

The litigation in *Greene*, 5 Cal.App.4th 155, arose out of what the Court of Appeal described as "an unprecedented budgetary crisis at the outset of fiscal year 1991–1992, with expenditures projected to exceed revenues by more than $14 billion." (*Id.* at p. 163.) In response to this fiscal situation, the Budget Act of 1991 (1991 Budget Act), as enacted by the Legislature and

---

[16] When initially enacted in 1977, this legislation governing the collective bargaining process between certified employee organizations and the state was referred to as the State Employer-Employee Relations Act (SEERA) (former § 3524, as enacted by Stats. 1977, ch. 1159, § 4, p. 3751), but in 1986 it was renamed the Ralph C. Dills Act. (§ 3524, as amended by Stats. 1986, ch. 103, § 1, p. 237.)

signed by the Governor, included a provision that imposed a reduction of $351 million in the appropriations for employee compensation. The provision, however, did not specify how that reduction in employee compensation was to be achieved.[17]

After the 1991 Budget Act was enacted, the DPA (in its role as the bargaining representative for the state) and various employee organizations representing state employees met and conferred in an attempt to reach an agreement on salaries and other terms and conditions of employment. At the time of those negotiations, the prior MOU's—that is, the public sector equivalent of collective bargaining agreements—between these employee organizations and the state had expired, but the parties continued to negotiate in good faith for several months in the hope of reaching agreement on new MOU's. By early November 1991, however, the parties had reached an impasse in negotiations, and on November 5, 1991, the DPA notified the employee organizations that, although the state would continue to maintain the status quo as to many of the terms and conditions of employment set forth in the expired MOU's, with regard to two items—salaries and health benefits—the state, beginning on November 12, 1991, unilaterally would implement the terms set forth in its final offer, cutting the current salaries of the state employees represented by the employee organizations by 5 percent and reducing the employer's contribution rates for health care premiums for such employees to the amounts specified in the state's final offer.

Two employee organizations immediately challenged in superior court the DPA's actions, and the trial court, after a hearing, concluded that under the governing statutory provisions the DPA lacked authority unilaterally to reduce either wages or health benefits of represented state employees. With regard to wages, the trial court held that section 19826, subdivision (b) expressly precluded the DPA from unilaterally reducing the wages of represented employees. With regard to health benefits, the trial court concluded that, in the absence of an applicable MOU, the regular formula for state contributions to health care premiums set forth in former section 22825.1 applied and precluded the state from decreasing its contribution rates.

---

[17] The relevant provision of the 1991 Budget Act states: "Notwithstanding any other provision of this act, each item of appropriation in this act shall be reduced, as appropriate, to reflect a $351,000,000 reduction in General Fund employee compensation items. [¶] The Director of Finance shall allocate the necessary reductions to each item of appropriation to accomplish the reductions required by this section. [¶] This section shall not apply to appropriations made by Items 0110-001-001 [appropriations to the Senate], 0120-011-001 [appropriations to the Assembly], and 0160-001-001 [appropriations to the Legislative Counsel Bureau] of Section 2.00 of this act." (Stats. 1991, ch. 118, § 3.90, p. 1277.)

On appeal, the Court of Appeal agreed with the trial court's determination that the DPA lacked authority unilaterally to reduce the wages of represented employees, but disagreed with the trial court's conclusion with respect to health benefits.

In analyzing the validity of the DPA's action regarding wages, the appellate court in *Greene, supra*, 5 Cal.App.4th 155, initially explained that, in contrast to most other collective bargaining statutes, the Dills Act is a " 'supersession statute' " (*Greene*, at p. 174), meaning that when a provision of an MOU conflicts with an otherwise applicable statutory provision governing the terms and conditions of employment, the provision of the MOU generally "supersedes" or prevails over the terms of the otherwise applicable statute, without any need for further legislative approval of the conflicting MOU provision. (§ 3517.6.)[18] Because at that time the Dills Act contained no provision specifically addressing the question of what effect the expiration of an MOU would have on the terms and conditions set forth in the MOU, the court in *Greene* concluded that—once an MOU had expired—the terms and conditions of that MOU were no longer in force, and consequently that "[a]ny of the numerous statutory provisions specified in section 3517.6 which were superseded by conflicting terms in a subsisting MOU are no longer superseded once the MOU expires and those provisions then go into effect." (*Greene, supra*, at p. 176.)[19]

---

[18] As the court explained in *Greene*: "Prior to the enactment of the Dills Act in 1977, state employees' wages, hours and working conditions were determined by numerous provisions of the Government Code. For example, former section 18001 (now § 19824 . . .) governed the frequency of pay, former section 18025 (now § 19853 . . .) governed state holidays and former section 18854 (now § 19832 . . .) governed merit salary adjustments. The Dills Act, in section 3517.6, now expressly permits DPA and the state employee unions to supersede the above statutory provisions and more than 120 others governing state employees' wages, hours and working conditions by agreeing to MOU's which conflict with these provisions." (*Greene, supra*, 5 Cal.App.4th at p. 175, citations omitted.)

[19] Under other collective bargaining statutes, the expiration of a collective bargaining agreement or an MOU has a different effect.

Under the provisions of the National Labor Relations Act governing the collective bargaining process in the private sector (29 U.S.C. § 158 et seq.) and under the provisions of the California statutory schemes governing the collective bargaining or meet-and-confer process between local governments and their employees (§§ 3500–3510 [Meyers-Milias-Brown Act]) and between school districts and their employees (§§ 3540–3549.3 [Educational Employment Relations Act]), when a collective bargaining agreement or MOU expires the parties generally are required to maintain the status quo under the terms and conditions of the expired agreement during the period in which the parties continue to bargain in good faith on a new agreement, but once the parties reach an impasse in negotiations the employer generally is permitted unilaterally to implement its "last, best offer" with regard to particular terms and conditions of employment. (*Greene, supra*, 5 Cal.App.4th at pp. 188–189 [citing cases].)

As we explain below (*post*, pp. 1038–1039), several years after the decision in *Greene, supra*, 5 Cal.App.4th 155, the Dills Act was amended to change the rules that apply upon expiration

Because in that case the MOU's of the affected employee organizations had expired, the Court of Appeal in *Greene, supra,* 5 Cal.App.4th 155, looked to the terms of the general statute concerning the DPA's authority with respect to the salaries of state employees—section 19826—to determine whether the DPA had authority, under the circumstances presented, unilaterally to reduce the salaries of the employees in question.

The court in *Greene, supra,* 5 Cal.App.4th 155, pointed out that section 19826 draws a clear distinction between the DPA's authority with regard to *represented employees* as contrasted with its authority with regard to *nonrepresented employees.* With regard to nonrepresented employees, the DPA, under section 19826, *subdivision (a)* is authorized to "establish and adjust salary ranges for each class of position in the state civil service," but with regard to represented employees, section 19826, *subdivision (b)* provides that "[n]otwithstanding any other provision of law, the department shall not establish, adjust, or recommend a salary range for any employees in an appropriate unit where an employee organization has been chosen as the exclusive representative pursuant to Section 3520.5."[20]

The court in *Greene* concluded that "[t]he plain language of section 19826 supports the respondent court's conclusion that DPA may not unilaterally decrease salaries for represented employees." (*Greene, supra,* 5 Cal.App.4th at p. 174.) Further, after reviewing the structure and legislative history of the

---

of an MOU. (See § 3517.8, enacted by Stats. 2000, ch. 879, § 2, p. 6515.) The decision in *Greene,* however, rested upon the provisions of the Dills Act that were in effect at the time of that decision.

[20] At the time *Greene* was decided, section 19826 provided in full:

"(a) The [DPA] shall establish and adjust salary ranges for each class of position in the state civil service subject to any merit limits contained in Article VII of the California Constitution. The salary range shall be based on the principle that like salaries shall be paid for comparable duties and responsibilities. In establishing or changing such ranges consideration shall be given to the prevailing rates for comparable service in other public employment and in private business. The department shall make no adjustments which require expenditures in excess of existing appropriations which may be used for salary increase purposes. The department may make a change in salary range retroactive to the date of application for such change.

"(b) Notwithstanding any other provision of law, the department shall not establish, adjust, or recommend a salary range for any employees in an appropriate unit where an employee organization has been chosen as the exclusive representative pursuant to Section 3520.5.

"(c) On or before January 10 of each year, the department shall submit to the parties meeting and conferring pursuant to Section 3517 and to the Legislature, a report containing the department's findings relating to the salaries of employees in comparable occupations in private industry and other governmental agencies.

"(d) If the provisions of this section are in conflict with the provisions of a memorandum of understanding reached pursuant to Section 3517.5, the memorandum of understanding shall be controlling without further legislative action, except that if such provisions of a memorandum of understanding require the expenditure of funds, the provisions shall not become effective unless approved by the Legislature in the annual Budget Act." (Stats. 1983, ch. 1258, § 1.4, pp. 4979–4980.)

Dills Act, the court explained: "Given that this statute denies DPA the power unilaterally to set salaries, the Legislature must have intended that unresolved wage disputes return to the Legislature for final determination." (*Greene*, at p. 182.)

The DPA argued in that case that it was unreasonable to interpret the relevant statutes to preclude the DPA from acting unilaterally with regard to wages when a reduced budget appropriation (triggered by a large projected budget shortfall) created a need to reduce wages and when the parties had bargained to impasse over the wage issue. The court in *Greene* explained, however: "[G]iven that DPA's and the unions' authority to set salaries derives from a legislative delegation, it is not at all absurd that the Legislature would reserve its authority to act in the event of a stubborn wage dispute. . . . Considering also the highly political nature of this dispute, it makes further sense that it will be ultimately resolved in the political branch. Our conclusion is consistent with the Dills Act, which represents only a limited delegation of the Legislature's salary-setting function, and includes numerous provisions suggesting the Legislature intended to retain final determination of state salaries." (*Greene, supra*, 5 Cal.App.4th at p. 182.) Finally, rejecting the DPA's suggestion that the conclusion reached by the Court of Appeal "shuts out the Governor (i.e., DPA) from the process of establishing state salaries" (*ibid.*), the court in *Greene* pointed out that "[t]he Governor retains his veto power over any subsequent wage legislation." (*Ibid.*)

At the same time the Court of Appeal upheld the trial court's determination that the DPA lacked authority, even at impasse, to reduce unilaterally the wages of represented employees, the appellate court reached a contrary conclusion regarding the validity of the DPA's proposed reductions in employer contributions to health care premiums. As noted, the trial court had concluded that, in the absence of an applicable MOU, the state employer's contributions to health care premiums were governed by former section 22825.1, the general statute prescribing the amount of employer contributions in the absence of a conflicting MOU. The Court of Appeal, however, concluded that section 22825.15—a narrower, more specific statutory provision enacted "during the height of the 1991–1992 budget crisis" and sent to the Governor as part of an urgency measure just days before the Legislature sent him the 1991 Budget Act (*Greene, supra*, 5 Cal.App.4th at p. 190)—was intended to apply in these circumstances, and that under this statute the contribution rates for health care premiums regarding represented employees were to be determined through " 'the collective bargaining process.' " (*Ibid.*) Furthermore, the Court of Appeal found that, in light of the specific context in which section 22825.15 was enacted, the term "collective bargaining process" as used in that statute properly should be interpreted to permit the DPA, after the parties have bargained to impasse, to implement its last, best, and final offer. (*Greene*, at p. 191 ["the Legislature intended that the issue of

health premium contribution rates would be resolved by DPA, through negotiations, if possible, but failing that, through unilateral action"].)

In rejecting the trial court's conclusion that the two potentially applicable statutes should be harmonized by interpreting the provisions of former section 22825.15 to permit the parties to negotiate contribution rates but, failing agreement, to require the state to comply with the ordinarily applicable contribution rates set forth in section 22825.1, the Court of Appeal observed that section 22825.15 "contains undebatable evidence the Legislature intended it to supersede the provisions of section 22825.1." (*Greene, supra,* 5 Cal.App.4th at p. 192.) Moreover, the Court of Appeal explained that in view of the context in which section 22825.15 was adopted, the result produced by the trial court's reasoning could not have been intended. The court in *Greene* stated in this regard: "Given that section 22825.15 was enacted as urgency legislation to address the $14 billion budget shortfall, it is inconceivable the Legislature intended to have the parties engage in collective bargaining only to have the most favorable [health care premium contribution] formula [from the employees' perspective] apply in the absence of an agreement." (*Greene,* at p. 192.)

Accordingly, the Court of Appeal in *Greene, supra,* 5 Cal.App.4th 155, reversed the judgment rendered by the trial court insofar as it restrained the DPA from changing the state's contribution to the health care premiums of represented employees, but affirmed the judgment insofar as it restrained the DPA from unilaterally implementing the proposed 5 percent pay cut for represented employees.

**2**

The Court of Appeal's decision in *Tirapelle, supra,* 20 Cal.App.4th 1317, like its decision in *Greene, supra,* 5 Cal.App.4th 155, arose in the wake of the state's 1991 fiscal emergency and the enactment of the provision in the 1991 Budget Act that reduced the appropriations for state employee compensation by a specified amount but did not direct how that reduction should be achieved. (See, *ante,* at p. 1017, fn. 17.) Unlike *Greene,* however, *Tirapelle* involved the validity of a 5 percent salary reduction that the DPA proposed to apply to *nonrepresented* state employees—that is, state employees not covered by the collective bargaining provisions of the Dills Act. Thus the validity of the DPA's action did not call for interpretation or application of the provisions of the Dills Act, but rather turned on the proper interpretation and application of the DPA's authority with regard to nonrepresented employees.

The legal proceeding in *Tirapelle, supra,* 20 Cal.App.4th 1317, resulted from a conflict between the DPA and the Controller. At the outset of the

1991–1992 fiscal year, the DPA announced that a 5 percent salary reduction for certain nonrepresented state employees would take effect immediately. The Controller initially implemented those reductions, but in September 1991 announced he would cease implementing them and would repay the affected employees the sums that previously had been withheld, based upon his determination that the DPA lacked authority to impose the salary reductions. The DPA responded by filing the underlying action in *Tirapelle*, seeking a writ of mandate to compel the Controller to implement the salary reductions. A number of employee organizations intervened, supporting the Controller's action.[21] After holding a hearing, the trial court granted the relief sought by the DPA, and the Controller and the intervening employee organizations appealed.

On appeal, after carefully reviewing the respective roles played by the Department of Finance, the DPA, and the Controller (*Tirapelle, supra*, 20 Cal.App.4th 1317, 1320–1324, 1327–1335), the Court of Appeal addressed the principal contention advanced by the Controller and the employee organizations: that the DPA, in imposing an across-the-board 5 percent reduction in salaries for nonrepresented employees, had exceeded its authority under section 19826, subdivision (a) to establish and adjust the salaries of nonrepresented employees.[22]

Earlier in its opinion, the court in *Tirapelle, supra*, 20 Cal.App.4th 1317, explained that because the 1991 Budget Act had reduced the appropriations for state employee compensation without explicitly directing how such reductions should be implemented, the DPA was confronted with a difficult choice. The court observed: "There are limited means by which employee compensation can be reduced so as to stay within employee compensation budget allotments. The available means fall into the broad categories of reducing the size of the work force, reducing the compensation payable on a per-employee basis, or some combination thereof." (*Tirapelle*, at p. 1324.) The court then explained: "The DPA asserts that the employee compensation allotment reductions of the Budget Act of 1991 raised the specter of significant employee layoffs. It therefore determined to attempt to reduce

---

[21] The nonrepresented employees whose salaries were at issue in *Tirapelle, supra*, 20 Cal.App.4th 1317, were managerial and supervisory employees. Although excluded from collective bargaining under the Dills Act, such employees are permitted under other statutory provisions to form employee organizations that may represent them in employment relations with the state. (§ 3525 et seq. [Bill of Rights for State Excluded Employees].) In light of these provisions, the Court of Appeal in *Tirapelle* agreed with the trial court that it was appropriate to permit the employee organizations to intervene on behalf of their members. (*Tirapelle*, at p. 1327, fn. 14.)

[22] The version of section 19826, subdivision (a) then in effect is set forth in full, *ante*, at page 1019, footnote 20.

salaries in order to minimize the need for layoffs. The salary reduction target chosen by the DPA was 5 percent per employee." (*Ibid.*)

In challenging the validity of the DPA's action in light of the provisions of section 19826, subdivision (a) the Controller asserted, among other contentions, that "the DPA took its salary reduction actions out of a general concern for the state's fiscal condition and that the state's fiscal condition is a matter for the Legislature rather than the DPA to resolve." (*Tirapelle, supra,* 20 Cal.App.4th at p. 1336.) In responding to this argument, the court in *Tirapelle* explained: "In 1945, when public employee salaries were determined by the State Personnel Board, former section 18850, the predecessor to section 19826, included the state's financial condition in the list of factors to be considered in setting salaries. [Citation.] That factor was deleted from former section 18850 in 1949. [Citation.] We may assume for purposes of argument that a general concern over the state's financial condition is not an appropriate factor for the DPA to consider but such an assumption does not advance the position of the Controller or the interveners. *Here, the DPA was concerned with specific legislative reductions of the allotments and appropriations available for employee compensation and that is a matter that the DPA certainly must consider."* (*Id.* at pp. 1336–1337, fn. 25, italics added.)

One of the intervener employee organizations in *Tirapelle* argued alternatively that "the power to establish and adjust salary ranges granted to the DPA by section 19826, subdivision (a), does not include the authority to adjust salaries within the ranges thus set," and therefore that the DPA lacked authority to reduce the salaries of those employees whose prior salary would be within the new range established by the DPA. (*Tirapelle, supra,* 20 Cal.App.4th at p. 1342.) The court in *Tirapelle* emphatically rejected this contention, noting that although salary levels for state employees have been set by long-standing practice as a range, the DPA traditionally has possessed and exercised authority to establish and adjust salaries *within* such ranges. (*Id.* at pp. 1342–1343.)

In sum, the Court of Appeal in *Tirapelle, supra,* 20 Cal.App.4th 1317, concluded that the Controller and interveners had failed to establish a lawful basis for the Controller's *blanket* refusal to implement the DPA's 5 percent salary reductions with regard to exempt and nonrepresented state employees. Accordingly, the court in *Tirapelle* affirmed the trial court's judgment in favor of the DPA.[23]

---

[23] Although the Court of Appeal in *Tirapelle, supra,* 20 Cal.App.4th 1317, held that the Controller's blanket refusal to implement the DPA salary reductions for nonrepresented employees was improper, at the same time the court cautioned that it was "unnecessary, and indeed unwarranted, for [the appellate court] to determine whether with respect to any particular department, agency, or employee, the DPA has exceeded its authority." (*Id.* at

**3**

Although the circumstances underlying the decisions in *Greene* and *Tirapelle* differ in a number of respects from those present in the case now before us, those decisions nonetheless provide useful analytical guidance for our resolution of the instant dispute. First, both of these appellate decisions demonstrate that, even in a fiscal emergency, the question whether the Governor or the DPA possesses the authority unilaterally to alter the wages or other terms and conditions of employment of state employees depends upon a close and careful interpretation of the applicable statutory provisions. Second, the decision in *Greene* makes clear that, particularly with respect to represented state employees, the Legislature has demonstrated a special interest in retaining (through the budget process or otherwise) ultimate control over the salary and wages of such employees. Third, the decisions in both *Greene* and *Tirapelle* reveal that legislative provisions contained within a budget act (or in bills accompanying or in close proximity to that act) often provide the key to determining how reductions in employee compensation mandated by a budget act must or may be implemented.

We shall refer to the *Greene* and *Tirapelle* decisions in discussing a number of contentions advanced by the parties.

**V**

As noted above, the Governor contends that his executive order imposing a mandatory furlough on state employees is supported by several statutory provisions. In his initial opposition filed in the trial court, the Governor relied primarily upon section 3516.5 (a provision of the Dills Act), and less directly upon sections 19851, subdivision (a) and 19849 (which, respectively, set forth (1) the general state policy with regard to the workweek of state employees, and (2) the authority of the DPA to issue general regulations relating to hours of work and overtime). In upholding the validity of the Governor's action, the trial court relied primarily upon sections 19851, subdivision (a) and 19849. Accordingly, we turn first to those provisions and then discuss section 3516.5.

p. 1341.) The court explained in this regard: "The precise limits of the DPA's discretion, and the manner in which it must be exercised, cannot be determined in the abstract without reference to a specific department or agency or, in fact, to a specific employment position. The grant of discretionary authority to the DPA is general in nature and it can certainly be limited or circumscribed in its exercise by specific provisions of law applicable to an employing power. Accordingly, the nature of the DPA's approval authority is not necessarily uniform throughout the state, but may vary in accordance with the amount of supervisory authority granted or denied to specific departments and agencies." (*Id.* at pp. 1340–1341, fns. omitted.)

## A

Section 19851, subdivision (a) reads in full: "It is the policy of the state that the workweek of the state employee shall be 40 hours, and the workday of state employees eight hours, except that workweeks and workdays of a different number of hours may be established in order to meet the varying needs of the different state agencies. It is the policy of the state to avoid the necessity for overtime work whenever possible. This policy does not restrict the extension of regular working-hour schedules on an overtime basis in those activities and agencies where it is necessary to carry on the state business properly during a manpower shortage."

It is somewhat ironic that both the Governor and plaintiffs contend the first sentence of section 19851, subdivision (a) supports their diametrically opposed positions in this case. As we explain, we conclude that the statute, properly understood, does not support either party's position, but instead simply is not relevant to the type of mandatory unpaid furlough program at issue in the present proceeding.

■ The initial sentence of section 19851, subdivision (a) establishes a general state policy of a 40-hour workweek and an eight-hour day, but also provides that "workweeks and workdays of a different number of hours may be established in order to meet the varying needs of the different state agencies." Contrary to the Governor's argument, in our view the plain language of the provision cannot reasonably be interpreted to authorize the furlough plan instituted by the Governor's executive order. The furlough plan at issue does not establish different hours "to meet the varying needs of the different state agencies," but rather imposes an *across-the-board* rule that applies to virtually all executive branch agencies, regardless of their varying needs.

The trial court suggested in its ruling that the furlough plan in question could be brought within the language of section 19851, subdivision (a) on the theory that, in light of the state's fiscal problems, the furlough met the needs of all state agencies by minimizing the risk they would run out of funds before the end of the fiscal year and as a result be unable to meet their statutorily mandated functions. The statutory language, however, speaks of "the *varying* needs of the *different* state agencies" (*ibid.*, italics added), demonstrating that the statute contemplated that the length of workweeks or workdays could be varied based on the particular functions and needs of individual agencies, and was not intended to encompass a rule or regulation that changed the length of the workweek for all, or virtually all, executive branch agencies.

Moreover, when related statutory provisions and administrative regulations are considered, it is apparent that the furlough program at issue in this case has no effect on the "workweek" as that term is employed in section 19851. The related statutes and regulations reveal that the principal purpose served by the designation of a normal "workweek" in section 19851 is to establish the number of hours that an employee may be required to work in a given week before the employee is entitled to receive overtime compensation for additional hours worked during that week. (See, e.g., §§ 19843, 19844, 19844.1, 19845, 19846, 19849, 19849.4 [all relating to overtime compensation]; Cal. Code Regs., tit. 2, § 599.700 [" 'Overtime' is authorized time worked in excess of regularly scheduled workweek."].) (Similarly, the designation of a normal "workday" in § 19851, subd. (a) defines the number of hours an employee may be required to work in a day before the employee may be entitled to receive overtime compensation for additional hours worked that day.)[24]

The legislative history of section 19851 fully supports this understanding of the statute, which traces its roots to section 73 of the State Civil Service Act, initially enacted in 1943. (Stats. 1943, ch. 1041, § 1, pp. 2976–2977.) That statute required the State Personnel Board to determine and establish the normal workweek for each class of state employees for which a monthly salary range was fixed, providing that "[f]or purposes of determining eligibility for overtime compensation" the State Personnel Board "shall allocate, and reallocate as the needs of the service require," each such class into "(1) [c]lasses with a normal work week of 40 hours; [¶] (2) [c]lasses with a normal work week of 44 hours; [¶] (3) [c]lasses with a normal work week of 48 hours; [¶] [and] (4) [c]lasses which can not be included in any plan for payment of overtime because: [¶] (a) [w]hile requiring at least 40 hours per week, the duties and responsibilities are such that they do not adapt themselves to a maximum number of hours per week[, or] [¶] (b) [t]he performance of duties is required on a part-time and intermittent basis and does not amount to a maximum of 40 hours per week."

In 1945, the provisions of section 73 of the State Civil Service Act were transferred to former section 18020 of the Government Code. (Stats. 1945, ch. 123, § 1, p. 535.) As originally enacted in 1945, former section 18020

---

[24] Section 19852, approving a four-day workweek for state employees, is consistent with this interpretation of section 19851. Section 19852 authorizes the Governor to "require that the 40-hour workweek established as the state policy in Section 19851 shall be worked in four days in any state agency or part thereof." This provision, authorizing an alternative four-day 40-hour workweek, overrides section 19851 insofar as the latter statute otherwise would entitle an employee who completes a 40-hour workweek in four days to overtime compensation for the additional hours (beyond eight hours a day) that the employee regularly works under such a schedule. (Accord, Lab. Code, § 511, subd. (b).)

provided: "For the purpose of determining eligibility for overtime compensation, the State Personnel Board shall establish the normal work week for each class in the State civil service. . . ." The statute then set forth the same three-tier workweek schedule—40 hours, 44 hours, and 48 hours—contained in the earlier provision. At the same time, the Legislature enacted former section 18021, which provided that "[e]very State employee compensated on a monthly basis required and ordered to work in excess of a normal work week as established by the State Personnel Board for his class . . . shall receive overtime compensation for all such overtime." (Stats. 1945, ch. 123, § 1, p. 535.)

In 1947, former section 18020 was modified to eliminate the prior introductory clause referring to overtime compensation and to substitute the term "work week" for "normal work week" (Stats. 1947, ch. 1304, § 2, p. 2841), but former section 18021, as also amended in 1947, continued to provide that "[s]alaried state employees . . . shall, if required and ordered to work in excess of the hours prescribed for the group, receive overtime compensation for all such overtime work" (Stats. 1947, ch. 1304, § 3, p. 2842).

In 1955, former sections 18020 and 18021 again were amended in a single enactment. (Stats. 1955, ch. 1787, §§ 1, 2, pp. 3295–3296.) At that time, the Legislature added to former section 18020 the statutory language presently contained in the first sentence of section 19851—that is, the language establishing, as a matter of state policy, that a 40-hour workweek (rather than the prior three-tier scheme—40 hours, 44 hours, and 48 hours) generally would constitute the workweek for state employees, but also providing that "workweeks of a different number of hours may be established in order to meet the varying needs of the different state agencies." At the same time, former section 18021 was amended to provide that (1) for each class or position for which the State Personnel Board established a monthly or annual salary, the board shall establish and adjust "workweek groups" and assign each class or position to such a group, and (2) the board, "after considering the needs of the state service and prevailing overtime compensation practices, may establish workweek groups of different lengths or of the same length but requiring different methods of recognizing or providing compensation for overtime." Accordingly, under the 1955 legislation, the establishment and adjustment of workweeks for state employees under former sections 18020 and 18021 continued to be related to the determination of such employees' eligibility for overtime compensation.

In 1974, former sections 18020 and 18021 again were amended in a single enactment. (Stats. 1974, ch. 1368, §§ 2, 3, pp. 2962–2963.) As a result, former section 18020 established the eight-hour day as the generally applicable workday of state employees, but also recognized that workdays of a

different number of hours could be established to meet the varying needs of different state agencies. Former section 18021, in turn, was amended to authorize the State Personnel Board to provide "for the payment of overtime in designated classes for work performed after the normal scheduled workday or normal scheduled workweek." (Stats. 1974, ch. 1368, § 3, p. 2963.)

In 1981, the Legislature adopted comprehensive legislation (Stats. 1981, ch. 230, § 55, pp. 1168–1232) that added section 19815 to the Government Code, creating the DPA, and section 19816, transferring to that department (among other functions) "the duties, purposes, responsibilities, and jurisdiction exercised by the State Personnel Board with respect to the administration of salaries, hours, and other personnel-related matters, training, performance evaluations, and layoffs and grievances." The 1981 legislation also transferred the provisions of former section 18020, relating to the workweek of state employees, to a newly enacted section 19851, and transferred the provisions of former section 18021 to a newly enacted section 19843. Thus, whereas section 19851 now sets forth the general state policy with regard to the workweek and workday of state employees, section 19843 currently directs the DPA to establish and assign to a workweek group each class or position in state employment for which a monthly or annual salary range is established. Section 19843 further provides: "The department, after considering the needs of the state service and prevailing overtime compensation practices, may establish workweek groups of different lengths or of the same length but requiring different methods of recognizing or providing compensation for overtime. The department may also provide for the payment of overtime in designated classes for work performed after the normal scheduled workday or normal scheduled workweek." (§ 19843, subd. (a).)

This legislative history confirms that the purpose underlying section 19851's designation of a "workweek" for state employees is to establish the number of hours an employee must work before potentially becoming eligible for overtime compensation.

■ The furlough program instituted by the Governor does not purport to alter the "workweek" of the affected state employees, as that term is used in section 19851. In weeks that include a mandatory furlough day, a state employee's "workweek," for purposes of section 19851, remains at 40 hours, and the employee is entitled to overtime compensation only if he or she works more than 40 hours during that week. The DPA's own internal memoranda advising other state agencies regarding the proper application of the furlough confirm that this is the case. (See DPA, Mem. to Personnel Management Liaisons (hereafter DPA PML Memo) No. 2009-007 (Feb. 3, 2009) p. 2; DPA PML Memo No. 2009-010 (Feb. 11, 2009) p. 1;

DPA PML Memo No. 2009-030 (July 8, 2009) p. 1 [all available at
<http://www.dpa.ca.gov/personnel-policies/pmls/index.htm> (as of Oct. 4,
2010)].)

Other statutes that encompass situations in which employees work less than
a full 40-hour week *for reduced compensation* refer to the applicable program
as one involving "reduced worktime," and do not suggest that the employee's
reduced schedule constitutes the employee's "workweek" for purposes of
section 19851. (See §§ 19996.19–19996.29 [Reduced Worktime Act].)
Viewed in context, the provisions of section 19851, subdivision (a) simply
were not intended to apply to the type of unpaid furlough at issue in the
present case. Thus, we disagree with the trial court's conclusion that section
19851, subdivision (a) reasonably may be interpreted to provide the Governor
and the DPA with the authority to institute the mandatory unpaid furlough
program in question.

At the same time, we also reject the contention, advanced by a number of
plaintiffs, that the provisions of section 19851, subdivision (a) properly
should be interpreted *to preclude* the Governor from adopting the fur-
lough program at issue. These plaintiffs, relying upon the history of section
19851, subdivision (a) that we briefly have summarized (see, *ante*, at
pp. 1026–1028), contend that the statute should be interpreted to permit the
DPA to adopt only varying work schedules that provide for workweeks of
more than 40 hours, but not to authorize the DPA to adopt a workweek of less
than 40 hours. In our view, however, nothing in either the language or the
history of section 19851, subdivision (a) suggests that in an appropriate
circumstance—for example, when a particular type of employment is particu-
larly stressful or arduous and a shorter workweek is considered necessary for
the health of the employee or the safety of the public—the DPA would not be
authorized to establish a normal workweek of less than 40 hours. Further-
more, as already explained, the term "workweek" as employed in section
19851, subdivision (a) simply refers to the maximum numbers of hours an
employee may be required to work before becoming eligible for overtime
compensation; it does not guarantee a minimum number of hours that a state
employer must permit an employee to work. Thus, just as section 19851,
subdivision (a) cannot properly be interpreted *as authorizing* the Governor to
impose the furlough here at issue, the provision also cannot properly be
interpreted *as prohibiting* the Governor from imposing such a furlough. The
statute simply does not address the furlough situation.

The trial court was mistaken for an additional reason in concluding that
section 19851, subdivision (a) authorized the Governor's furlough order.
Subdivision (b) of that statute explicitly provides that "[i]f the provisions of

this section are in conflict with the provisions of a memorandum of understanding reached pursuant to Section 3517.5, the memorandum of understanding shall be controlling without further legislative action . . . ." (§ 19851, subd. (b).) Thus, with respect to represented state employees who are covered by an applicable MOU—like the employees on whose behalf the present litigation was brought—the Governor's furlough program would be authorized and valid only if the MOU granted the Governor or the DPA the authority unilaterally to impose such a program without the prior agreement of the affected employee or his or her certified bargaining representative. In such an instance, it would be the MOU, rather than section 19851, subdivision (b) that would constitute the source of the Governor's authority to act.

Finally, it is our view that the trial court's heavy reliance upon the workweek provisions of section 19851, subdivision (a) as providing authority for the Governor's furlough order, fails to take adequately into account the circumstance that the reduction in workdays mandated by this order was neither the primary purpose nor the primary effect of the order. It is clear from the situation in which the executive order was issued that the purpose of the furlough program here at issue was to reduce state expenses by reducing the state funds paid to state employees. The two-day-a-month furlough was adopted not because there was a lack of work or a reduced need for state services that reasonably called for a reduction in workdays, but rather as a means to reduce the state's payroll expenses in light of the state's fiscal problems. Focusing upon the aspect of the program that reduced the number of days the affected employees were permitted to work fails to give adequate consideration to the substantial reduction in the wages or earnings of state employees that constituted the primary effect of the furlough program on the employees in question. Although the Governor's decision to achieve the desired reduction in state employee compensation expenses through a mandatory unpaid furlough rather than through a simple pay cut afforded some mitigating benefits to employees, in the final analysis the reduction in the wages earned by the affected employees—and the corresponding savings obtained by the state—were the most significant changes in the terms and conditions of employment effectuated by the Governor's executive order. Nothing in section 19851, subdivision (a) purports to provide the Governor or the DPA with the authority to impose a unilateral across-the-board reduction of state employees' wages or earnings in this fashion.

In sum, for all of the above reasons, we conclude the trial court erred in ruling that the provisions of section 19851, subdivision (a) authorized the Governor to institute unilaterally the challenged furlough program.

## B

In upholding the Governor's action, the trial court also relied upon section 19849. Subdivision (a) of that statute provides in full: "The [DPA] shall adopt rules governing hours of work and overtime compensation and the keeping of records related thereto, including time and attendance records. Each appointing power shall administer and enforce such rules." (§ 19849, subd. (a).)

As is evident from the language of this statute, it does not purport to grant the DPA additional *substantive* authority over the hours state employees work or the wages they earn, but simply authorizes the DPA to adopt administrative rules that the employing state agency is to enforce, including recordkeeping rules related to hours of work and overtime compensation. The trial court, having concluded that section 19851, subdivision (a) provided the substantive authority for the Governor and the DPA to reduce the hours state employees would be permitted to work, determined that the Governor's December 19, 2008, executive order directing the DPA to implement the furlough program constituted a "rule" within the meaning of section 19849, subdivision (a) and thus was a permissible means of instituting the program.

Because we have concluded that section 19851 does not authorize the Governor or the DPA to institute the challenged furlough program, section 19849 clearly does not independently provide the Governor or the DPA with such authority.[25]

## C

In addition to relying upon sections 19851 and 19849, the Governor also contends that section 3516.5—a provision contained in the Dills Act—provides support for his authority to issue the December 19, 2008, executive order instituting the furlough program. We conclude that section 3516.5 does not provide such authority.

This statute provides in full: "Except in cases of emergency as provided in this section, the employer shall give reasonable written notice to each recognized employee organization affected by any law, rule, resolution, or regulation directly related to matters within the scope of representation proposed to be adopted by the employer, and shall give such recognized employee organizations the opportunity to meet and confer with the administrative officials or their delegated representatives as may be properly designated by law.

---

[25] Moreover, like section 19851, section 19849 explicitly provides that the statute may be superseded by an applicable MOU. (§ 19849, subd. (b).)

"In cases of emergency when the employer determines that a law, rule, resolution, or regulation must be adopted immediately without prior notice or meeting with a recognized employee organization, the administrative officials or their delegated representatives as may be properly designated by law shall provide such notice and opportunity to meet and confer in good faith at the earliest practical time following the adoption of such law, rule, resolution, or regulation." (§ 3516.5.)

 In their briefing on appeal, plaintiffs initially question whether the term "emergency" in section 3516.5 was intended to encompass a *fiscal* emergency like that addressed in article IV, section 10(f), or instead was intended to apply only to the type of emergencies referred to in section 3523 (another section of the Dills Act), which lists such instances as "an act of God, natural disaster, or other emergency or calamity affecting the state, and which is beyond the control of the employer or recognized employee organization . . . ." (§ 3523, subd. (d).) There is no need to resolve this point in the present case, however, because even if we assume that the "emergency" provision of section 3516.5 reasonably should be interpreted to include a fiscal emergency, we conclude the statute's plain language makes it clear that the provision was not intended to, and does not, constitute a source of *substantive* authority for the state to take any particular type of action regarding the terms and conditions of employment.

By its terms, the first paragraph of section 3516.5 simply provides that, as a general matter, when state employees are represented by a recognized employee organization, the employer is required to provide the organization with notification and an opportunity to meet and confer *before* the employer implements any law, rule, resolution, or regulation directly relating to matters within the scope of representation. The second paragraph of section 3516.5 recognizes an exception to the requirement of prior notice and an opportunity to meet and confer, which comes into play "[i]n cases of emergency." The employer, in such circumstances, may implement the proposed action without first notifying the employee organization and giving it an opportunity to meet and confer on the matter, but still must notify and meet and confer with the organization regarding the action as soon as practical.

Neither the first nor the second paragraph of section 3516.5 purports to provide a source of authority for a state employer to take any particular type of substantive action in either a nonemergency or emergency situation. Instead, the statute, reasonably interpreted, simply provides that when an employer possesses the authority *from some other source* to take a particular type of action relating to matters within the scope of representation, the employer ordinarily must notify and meet and confer with the employee organization before taking such action, but in an emergency may take the

action and thereafter notify and meet and confer with the organization as soon as practical. Accordingly, we conclude that section 3516.5 cannot properly be interpreted as providing the Governor with authority to institute the mandatory unpaid furlough program here at issue.[26]

# VI

Although we have concluded that none of the specific statutes relied upon by the Governor—sections 19851, 19849, and 3516.5—provides the Governor the authority to institute unilaterally a mandatory unpaid furlough of state employees by executive order, we consider whether such authority may arise from some other source.

This authority conceivably could derive from one or more of the numerous statutory provisions enacted by the Legislature that grant the DPA, or a particular appointing agency, administrative discretion over various aspects of state employment. (See, e.g., §§ 19816, 19816.10.)[27] As noted above, no one

---

[26] The Court of Appeal's decision in *Greene, supra*, 5 Cal.App.4th 155, discussed above, is consistent with this conclusion. As we have seen, the *Greene* case, like the present matter, arose in the context of a fiscal emergency, and the 5 percent pay cut that the DPA proposed to implement was aimed at reducing state expenses to avert a significant budgetary shortfall. Nonetheless, the court did not suggest in *Greene* that, by virtue of the provisions of section 3516.5, the fiscal emergency itself provided authority for the DPA to take its proposed action. The court, in determining whether the DPA was authorized to take the proposed action, instead looked to other statutes governing the authority of that department. As we have seen, the court concluded in *Greene* that, under the applicable statutes, the DPA lacked authority to reduce unilaterally the wages of represented employees, even in the midst of a fiscal emergency.

[27] Section 19816 specifies: "(a) Except as provided by Section 19816.2 [relating to the State Personnel Board's responsibility for assuring consistency with merit employment principles], the [DPA] succeeds to and is vested with the duties, purposes, responsibilities, and jurisdiction exercised by the State Personnel Board with respect to the administration of salaries, hours, and other personnel-related matters, training, performance evaluations, and layoffs and grievances. [¶] (b) The [DPA] succeeds to and is vested with the duties, purposes, responsibilities, and jurisdiction exercised by the California Victim Compensation and Government Claims Board . . . with respect to the administration of miscellaneous employee entitlements. [¶] (c) The [DPA] succeeds to and is vested with the duties, purposes, responsibilities, and jurisdiction exercised by the Department of Finance with respect to the administration of salaries of employees exempt from civil service and within range salary adjustments."

Section 19816.10 provides: "(a) In order to secure substantial justice and equality among employees in the state civil service, the [DPA] may provide by rule for days, hours and conditions of work, taking into consideration the varying needs and requirements of the different state agencies and the prevailing practices for comparable services in other public employment and in private business. [¶] (b) If the provisions of this section are in conflict with the provisions of a memorandum of understanding reached pursuant to Section 3517.5, the memorandum of understanding shall be controlling without further legislative action, except that if such provisions of a memorandum of understanding require the expenditure of funds, the provisions shall not become effective unless approved by the Legislature in the annual Budget Act."

disputes that the state may take *some* unilateral steps relating to state employment in the event of a fiscal emergency in order to reduce future expenditures of state funds—for example, choosing not to fill vacant positions for which compensation already has been appropriated, or encouraging state·employees voluntarily to take unpaid leave. The question presented here is whether any provision affords the Governor or the DPA authority to reduce expenditures during a fiscal emergency by imposing a mandatory reduction of the work hours and wages of state employees.

█ In examining this question, it is important to recognize that the Legislature has enacted a statutory provision that explicitly authorizes a state employer to *"lay off"* state employees for "lack of . . . funds." Section 19997 provides in this regard: "Whenever it is necessary because of lack of work or funds, or whenever it is advisable in the interests of economy, to reduce the staff of any state agency, the appointing power may lay off employees pursuant to this article and department rule."[28] The statutory provisions following section 19997 prescribe the procedure by which such layoffs are to be implemented—generally following a reverse seniority protocol—and additionally provide that the order in which such layoffs are made can be modified by the provisions of an MOU (unless the State Personnel Board finds the terms of the MOU to be inconsistent with the merit principles embodied in art. VII of the Cal. Const.). (See §§ 19997.2–19997.14, 3517.6, subd. (b).)[29]

---

[28] The circumstance that section 19997 grants the authority to lay off employees for lack of funds to "the appointing power" (rather than to the DPA or some other entity or executive officer) highlights one of the complications that arise in discussing the authority that *the state* possesses to take actions or to make decisions *in its role as an employer.* In the public sphere, questions may arise over whether an action that the state is entitled to undertake in its role as an employer may be approved or undertaken (1) exclusively by the executive branch or, alternatively, exclusively by the legislative branch, (2) by either of those two branches, or (3) only with the concurrence of both branches. Further, in instances in which it is clear that an action may be undertaken unilaterally by the executive branch, further questions may arise over which public official or entity within the executive branch is authorized to determine whether to act, and, if so, in what manner and to what degree. (See, e.g., *Tirapelle, supra,* 20 Cal.App.4th at pp. 1337–1342 [discussing division of authority between the DPA and other executive branch agencies].)

In addressing the question whether the Governor or the DPA possesses the authority unilaterally to impose a mandatory unpaid furlough on state employees to address a substantial budget problem, our focus, in this part of our discussion, is upon whether the Governor or the DPA, as part of the executive branch, had authority to act without the concurrence of the Legislature, and not upon which official or entity within the executive branch may have authority to decide whether to impose such a mandatory furlough (as opposed to other cost-savings measures) on persons employed by a particular executive-branch constitutional officer or agency. We express no view on this latter issue—an issue presented in several cases now pending in the lower courts.

[29] Although the provisions governing *the procedure* by which such layoffs are to be implemented may be superseded by the terms of an MOU, the applicable statutes do not permit

There is no comparable statute, however, that explicitly authorizes the Governor, the DPA, or an appointing authority in the executive branch unilaterally to reduce state employees' wages, or to reduce state employees' hours and wages, due to a lack of funds. (Cf. §§ 68106, subd. (b)(3), 68108.)

Indeed, the only current statutory provision specifically addressing the subject of whether an executive branch employer may require state employees to work a reduced work schedule for a reduced salary or wage clearly provides no support for the Governor's position. In the Reduced Worktime Act (§§ 19996.19–19996.29), initially enacted in 1981, the Legislature sought to encourage state agencies to provide an opportunity for those employees who wished to reduce their worktime in exchange for a reduction in wages to do so *voluntarily*. (§§ 19996.19, subd. (a)(7), (8), 19996.21.) At the same time, one provision of that legislation—section 19996.22, subdivision (a)—specifies that "[a]ny employee who is being coerced, or *who has been required, by the appointing power,* a supervisor, or another employee, *to involuntarily reduce his or her worktime contrary to the intent of this article, . . . may file a grievance with the [DPA]*." (Italics added.) We recognize that the Reduced Worktime Act was not enacted with the circumstance of a state fiscal emergency in mind, and we agree with the Governor's contention that section 19996.22, subdivision (a) was not intended, and reasonably should not be interpreted, *to prohibit* the state from instituting an across-the-board mandatory unpaid furlough of all persons employed by the executive branch as a cost-saving measure in such an emergency. But although we agree that such a furlough is not "contrary to the intent of [the Reduced Worktime Act]" (§ 19996.22, subd. (a)) and thus that section 19996.22 should not be interpreted to prohibit the imposition of a mandatory unpaid furlough on state employees, this interpretation of the statute still leaves the Governor without an affirmative source authorizing him to take such action unilaterally.[30]

---

the provisions of section 19997 itself—the basic statute authorizing the appointing authority to lay off employees because of a lack of funds—to be superseded by an MOU. (See § 3517.6, subd. (b).)

[30] Section 19996.25—another provision of the Reduced Worktime Act—provides that if the provisions of that act are in conflict with the provisions of an MOU, the MOU shall be controlling. Accordingly, it appears that the parties to an MOU could authorize the state to implement an involuntary unpaid furlough program, perhaps as an alternative to layoffs under section 19997.

In another instance, the collective bargaining process constituted the impetus for the state's adoption of a personal-leave program—available to nonrepresented employees—under which employees voluntarily agree to receive reduced compensation in exchange for personal-leave credit. (See § 19996.3.) Section 19996.3, subdivision (b)(2) required the DPA to ensure that the program "is generally equitable and is consistent with the personal leave program provided to employees covered by memoranda of understanding" reached under the Dills Act.

■ It may be suggested that because a state employer possesses authority under section 19997 to lay off employees due to a lack of funds, it logically should follow that the state may impose an involuntary unpaid furlough on state employees on the theory that a furlough is a less drastic step than a layoff. This suggestion, however, overlooks the circumstance that the provisions authorizing a layoff for lack of funds specifically prioritize how these layoffs are to be imposed. Whereas such layoffs impose a very significant burden on a smaller number of employees with the least seniority, an involuntary unpaid furlough reduces the earnings of all affected state employees, most of whom would not suffer any direct economic burden if other employees are laid off. Because, as discussed above, the principal effect of an involuntary unpaid furlough on state employees is the reduction in the employees' salaries or earnings, we conclude that the Governor's or the DPA's authority unilaterally to institute such a furlough properly must be evaluated by considering whether the Governor or the DPA possesses the authority unilaterally to reduce state employee salaries or wages as a cost-saving measure.

■ As noted above in our discussion of the Court of Appeal decisions in *Greene, supra*, 5 Cal.App.4th 155, and *Tirapelle, supra*, 20 Cal.App.4th 1317 (see, *ante*, at pp. 1016–1023), under section 19826—the statutory provision governing the DPA's authority to establish and adjust state employee salaries—the authority that the Legislature has granted to the DPA with regard to state employee salaries differs significantly depending upon whether the employees fall within the category of nonrepresented employees or of represented employees.[31] With respect to nonrepresented employees, the DPA's salary-related authority is set forth in section 19826, subdivision (a) which lists the factors to be considered by the DPA in establishing and adjusting the salaries of such employees. With respect to represented employees, by contrast, section 19826, subdivision (b) provides that the DPA shall *not* establish or adjust the salaries of such employees through the process applicable to nonrepresented employees. This provision instead leaves the establishment and adjustment of the salaries of represented employees to be determined through the collective bargaining (or meet-and-confer) process established by the Dills Act.

The trial court in this matter, in rejecting plaintiffs' challenge to the furlough program, suggested that the program did not implicate the provisions of section 19826, on the theory that (1) this statute applies only to the DPA's authority to establish and adjust "salary ranges," and (2) the furlough order at issue did not affect the employees' "salary ranges" or "rate of pay."

---

[31] There has been no significant change in the language of section 19826 subsequent to the decision in *Greene, supra*, 5 Cal.App.4th 155. (See, *ante*, at p. 1019, fn. 20 [quoting § 19826].)

Past cases establish, however, that the DPA's authority under section 19826 extends to the establishment and adjustment of salaries *within* salary ranges as well as to the setting of maximum and minimum salaries (*Tirapelle, supra,* 20 Cal.App.4th at pp. 1342–1343), and the statute uniformly has been understood to be the source of the DPA's authority to recommend or impose across-the-board salary raises or salary cuts for state employees. (*Tirapelle,* at pp. 1342–1343; *Pacific Legal Foundation v. Brown, supra,* 29 Cal.3d at pp. 189–192.)

Furthermore, even though the mandatory furlough program did not alter an affected state employee's *hourly rate of pay,* the furloughs clearly did significantly reduce the wages or salary that a full-time state employee earns from his or her job—the monetary sum that obviously matters most to employees seeking to pay their rent or mortgages and support their families. Although the furlough may not have led the DPA formally to change the minimum and maximum dollar amounts set forth in its posted salary range for each individual state employee position (a forbearance consistent with the objective of not affecting future retirement benefits), as a result of the furlough the affected full-time state employees in such positions no longer were permitted to receive the full-time salary assigned to their position, but instead received only a lower salary, reflecting the reduction attributable to the furlough. Accordingly, in this practical sense, the furlough did "adjust" both the salary range and the salary pursuant to which full-time employees actually were compensated.[32] In view of both the purpose and the effect of the mandatory unpaid furlough plan here at issue, we conclude that, in the absence of some other source of authority to implement a plan involving a reduction of both worktime and pay, the authority or lack of authority of the Governor or the DPA unilaterally to institute the program must be determined under the provisions of section 19826.[33]

---

[32] Section 18550 provides that "[a] 'full-time' position or appointment is a position or appointment in which the employee is to work the amount of time required for the employee to be compensated *at a full-time rate.*" (Italics added.) And the DPA's own regulations, after defining " 'salary range' " as "the minimum and maximum *rate* currently authorized for the class" (Cal. Code Regs., tit. 2, § 599.666.1, subd. (a), italics added), go on to provide that the " 'rate' for employees compensated on a monthly basis is any one of the full dollar amounts found within the salary range and for employees compensated on a daily or hourly basis any one of the dollar and cents amounts found within the salary range" (*id.,* § 599.666.1, subd. (c); see also *id.,* § 599.669 ["The salary range for each class represents the rate of pay for full-time monthly employment unless the pay plan specifically states otherwise."]).

Because the overwhelming majority of full-time state employees are compensated on a monthly, rather than a daily or hourly, basis (see Cal. Dept. of Finance, Salaries and Wages 2010–2011, *passim,* <http://www.dof.ca.gov/budget/historical/2010–11/salaries_and_wages/> [as of Oct. 4, 2010]), a state employee's "full-time rate" generally refers to the employee's full-time salary, rather than the employee's hourly rate of pay.

[33] Although the trial court suggested that the furlough plan did not affect the salaries of state employees and did not implicate the DPA's authority to establish and adjust salary ranges

Although there is considerable reason to question whether the DPA's general authority to establish and adjust the salaries of nonrepresented employees under section 19826, subdivision (a) affords that entity the authority to impose unilaterally a mandatory unpaid furlough that reduces the wages or salaries of nonrepresented employees in order to mitigate an anticipated budget shortfall,[34] in the present case we need not resolve the question of the scope of the DPA's authority with respect to *nonrepresented* employees, because here the challenge to the Governor's executive order has been

under section 19826, the DPA itself, in numerous internal memoranda, repeatedly has acknowledged that the plan involved the DPA's authority to "adjust" salaries. Thus, for example, in the initial January 9, 2009, memorandum setting forth the means by which the furlough would be implemented, the Director of the DPA expressly stated that "[s]alaries *will be adjusted to reflect the unpaid furlough days*, but benefits will remain the same (i.e., the furlough will not affect payouts for unused leave, service credit, health and retirement benefits, etc.)." (Jan. 9, 2009 DPA Furlough Memo, *supra*, italics added.) Similarly, in the February 3, 2009, memorandum regarding the furlough program sent to personnel management liaisons, the chief deputy director of the DPA stated: "*We will adjust salaries to reflect two non-work days*. The adjustment applies only to the employee's base salary." (DPA PML Memo No. 2009-007, *supra*, p. 3 <http://www.dpa.ca.gov/personnel-policies/pmls/index.htm> [as of Oct. 4, 2010], italics added.)

[34] As discussed above (see, *ante*, at pp. 1012–1013), there is considerable evidence suggesting that prior to the time the Governor issued the December 19, 2008, executive order, it was generally understood that under the current state of California law, a governor could not implement such a measure unilaterally. In addition to the present Governor's own statements and actions consistent with this understanding, in recent years a number of Governors have proposed ballot measures or statutory provisions that would have revised California law to provide the Governor with some authority to make this type of midyear reduction in state employee compensation, but to date the voters have not approved any of these measures. (See, e.g., Prop. 165, Gen. Elec. (Nov. 3, 1992) § 5; Prop. 76, Gen. Elec. (Nov. 7, 2005) § 4; § 13312 [discussed, *post*, at pp. 1050–1051, fn. 38].)

Moreover, in *Pacific Legal Foundation v. Brown, supra*, 29 Cal.3d at pages 189–191 and footnotes 12 to 14, this court listed numerous instances in which the Legislature has demonstrated its interest in retaining ultimate control over across-the-board changes in the salaries and wages of all state employees, by frequently rejecting salary recommendations of the State Personnel Board. That historical experience casts doubt on the proposition that the existing statutes grant the Governor, even in a fiscal emergency, the authority unilaterally to reduce employee wages by an amount the Governor concludes is appropriate.

Furthermore, as noted above, in *Tirapelle, supra*, 20 Cal.App.4th 1317, the Court of Appeal pointed out that, although the predecessor to section 19826, subdivision (a) at one time had included the state's financial condition in the list of factors to be considered in setting salaries, that factor subsequently was deleted from the statute and has not been reinserted. In light of that legislative history, the court in *Tirapelle* "assume[d] for purposes of argument that a general concern over the state's financial condition is not an appropriate factor for the DPA to consider . . . ." (20 Cal.App.4th at pp. 1336–1337, fn. 25.) In *Tirapelle*, however, the DPA acted to reduce the salaries of nonrepresented and exempt employees after the Legislature already had enacted a budget act that reduced the appropriations available for employee compensation, and the court held that in light of that enactment, the reduced appropriations were "a matter that the DPA certainly must consider." (*Ibid.*) In the present case, of course, the Governor and the DPA acted before the Legislature enacted revisions to the 2008 Budget Act that reduced the appropriations for employee compensation contained in the original act.

brought only on behalf of *represented* state employees. As we shall explain, with regard to represented employees we are of the view that clearly, unless the Governor or the DPA had been granted the authority unilaterally to impose a mandatory unpaid furlough on affected represented employees by the terms of an applicable MOU, the Governor and the DPA lacked authority unilaterally to institute such a furlough through the December 19, 2008, executive order with respect to those employees.

As demonstrated by the Court of Appeal's decision in *Greene, supra*, 5 Cal.App.4th 155, the scope of the Governor's (and the DPA's) authority over the wages and hours of represented state employees is governed by the provisions of the Dills Act. Under the circumstances of the present case, one of the most relevant provisions of that act is section 3517.8, which was added in 2000, several years after the Court of Appeal's decision in *Greene*, and which significantly changed the effect of the expiration of an MOU under the Dills Act.

As we have seen, in *Greene, supra*, 5 Cal.App.4th 155, the Court of Appeal concluded that when an MOU expired, all of the statutory provisions relating to the terms and conditions of state employment that had been superseded by the MOU once again became effective and thereafter governed the employer-employee relationship until a new MOU was agreed upon and became effective. (*Greene*, at pp. 174–178.) In addition, the court in *Greene* concluded that even when, as in that case, the parties had negotiated to a point of impasse, the DPA was not entitled to implement its final offer with regard to employee wages; instead, the appellate court held, under those circumstances the Dills Act left the resolution of the wage issue to the Legislature. (*Greene*, at pp. 178–182.)

Section 3517.8 significantly altered the effect of the expiration of an MOU under the Dills Act from that described in *Greene*. This statute currently provides in full:

"(a) If a memorandum of understanding has expired, and the Governor and the recognized employee organization have not agreed to a new memorandum of understanding and have not reached an impasse in negotiations, subject to subdivision (b), the parties to the agreement shall continue to give effect to the provisions of the expired memorandum of understanding, including, but not limited to, all provisions that supersede existing law, any arbitration provisions, any no strike provisions, any agreements regarding matters covered in the Fair Labor Standards Act of 1938 (29 U.S.C. Sec. 201 et seq.), and any provisions covering fair share fee deduction consistent with Section 3515.7.

"(b) If the Governor and the recognized employee organization reach an impasse in negotiations for a new memorandum of understanding, the state employer may implement any or all of its last, best, and final offer. Any proposal in the state employer's last, best, and final offer that, if implemented, would conflict with existing statutes or require the expenditure of funds shall be presented to the Legislature for approval and, if approved, shall be controlling without further legislative action, notwithstanding Sections 3517.5, 3517.6, and 3517.7. Implementation of the last, best, and final offer does not relieve the parties of the obligation to bargain in good faith and reach an agreement on a memorandum of understanding if circumstances change, and does not waive rights that the recognized employee organization has under this chapter."

In this case all parties agree that, on December 19, 2008, when the Governor issued his executive order directing the DPA to implement a mandatory two-day-a-month unpaid furlough plan, the terms and conditions of employment of the state employees represented by each of the plaintiff employee organizations were governed by an applicable MOU. Although each of the MOU's had expired, under section 3517.8 the terms of the expired MOU remained in effect, because the parties had not reached an impasse in their negotiations over a new MOU.

Because at the time the Governor issued his executive order the terms and conditions of employment of represented state employees were governed by the provisions of the then applicable MOU's, the Governor and the DPA lacked authority (independent of that provided by the MOU's) unilaterally to change the terms and conditions of employment covered by the MOU's. As explained above, under the provisions of section 3517.6, the terms and conditions embodied in an MOU supersede most of the general statutory provisions that govern the terms and conditions of state employment in the absence of an MOU, including, among many other statutes, the following: section 19851 (the workweek provision relied upon by the Governor), section 19849 (the provision giving DPA general authority to promulgate employment-related regulations), and section 19826 (governing the DPA's authority to establish and adjust salary ranges). Under the Dills Act, it is clear that an MOU, once approved by the Legislature (either directly—see § 3517.5—or through the appropriation of sufficient funds to pay the agreed-upon employee compensation), governs the wages and hours of the state employees covered by the MOU.

There can be little question that the issue whether an employee's wages may be reduced by the implementation of a mandatory furlough (and, if so, by what amount and with what input from the recognized employee organization) lies at the heart of the matter of "wages, hours, and other terms and

conditions of employment" that are the subject of an MOU. Accordingly, we conclude that under the Dills Act a state employer's unilateral authority to impose such a furlough on represented employees (in the absence of an impasse) is governed by the terms of the applicable MOU, rather than by any general statutory provision that applies in the absence of an MOU.

For all of the above reasons, we find unpersuasive the Governor's contention that either the constitutional authority granted to him by the California Constitution or the existing statutory provisions pertaining to the terms and conditions of state employment granted him or the DPA the authority unilaterally to impose a mandatory unpaid furlough on state employees.

## VII

### A

As noted above, although the trial court relied primarily upon sections 19851 and 19849 in ruling that the Governor possessed authority to impose the furloughs, the court additionally found that several provisions contained in the applicable MOU's also authorized the employer to impose furloughs unilaterally in emergency situations. In reaching the latter conclusion, the trial court relied in significant part on its conclusion that the MOU's incorporated the provisions of section 19851 relating to workweeks (which the trial court viewed as authorizing the mandatory unpaid furloughs), and in part on certain language included within the so-called "State's Rights" clauses contained in some (but not all) of the relevant MOU's.

In our view, the trial court's finding that the MOU's here at issue authorized the Governor unilaterally to reduce the hours and wages of covered employees in response to a burgeoning budget deficit is quite problematic. First, in view of our determination that the trial court erred in finding that the provisions of section 19851 relating to workweeks provide the Governor with the authority to institute mandatory unpaid furloughs, that court's reliance upon the MOU's general reference to section 19851 is likewise erroneous. Second, the trial court's discussion of the "State's Rights" clauses in the MOU's failed to take into account significant language contained in those clauses that appears to undermine the trial court's interpretation of the provisions.[35]

---

[35] One of the "State's Rights" clauses upon which the trial court relied was section 3.1.B of the MOU between the state and plaintiff CASE. That section of the CASE MOU provides in full: "To the extent consistent with law and this MOU, the rights of the State include, but are not limited to, the exclusive right to determine the mission of its constituent departments, commissions, and boards; set standards of service; train, direct, schedule, assign, promote, and transfer its employees; initiate disciplinary action; relieve its employees from duty because of

Nonetheless, even if the trial court erred in finding that the parties' MOU's authorized the Governor's unilateral action, and thus even if that court should have concluded that the Governor lacked authority to impose his mandatory furlough program unilaterally by executive order, we conclude for the reasons ·discussed below (relating to the Legislature's subsequent action on the Governor's budget proposal) that plaintiffs are not entitled to an order setting aside or invalidating the furlough program. (See, *post*, pt. VIII, pp. 1043–1052.)

**B**

In addition to the portions of section 3517.6 listing the numerous statutes that are superseded (without further legislative action) by the existence of a conflicting provision in an applicable MOU, subdivision (b) of that statute contains another clause that is relevant to the issue before us. It provides in

lack of work, lack of funds, or for other legitimate reasons; maintain the efficiency of State operations; determine the methods, means and personnel by which State operations are to be conducted; take all necessary actions to carry out its mission in emergencies; and exercise complete control and discretion over its organization and the technology of performing its work. The State has the right to make reasonable rules and regulations pertaining to employees consistent with this MOU provided that any such rule shall be uniformly applied to all affected employees who are similarly situated."

The trial court pointed to the language in this section permitting the state to "relieve its employees from duty because of lack of work, lack of funds, or for other legitimate reasons," but failed to take note of the introductory clause of section 3.1.B—"[t]o *the extent consistent with* law and *this MOU*" (italics added)—which suggests that the "State's Rights" clause was not intended to override all of the other, more specific provisions of the MOU governing wages, hours, and other terms and conditions of employment. Moreover, the clause recognizing the state's right to relieve its employees from duty because of "lack of funds"—the clause relied upon by the trial court—reasonably can be interpreted to refer only to the state's authority, under section 19997, to lay off employees for lack of funds. As will be recalled, section 19997 is one of the few statutes dealing with the terms and conditions of employment that is not subject to supersession under the Dills Act. (See, *ante*, at pp. 1034–1035, fn. 29.)

Two separate provisions of the MOU in question (§§ 10.2, 10.3) explicitly address the question of furloughs. Section 10.2 provides in relevant part that "[w]henever the State determines it is necessary to lay off employees, the State and the Union shall meet in good faith to explore alternatives to laying off employees such as . . . *voluntary* reduced work time . . . ." (Italics added.) Section 10.3 provides that "[t]he State may propose to reduce the number of hours an employee works as an alternative to layoff. Prior to the implementation of this alternative to a layoff, the State will notify and meet and confer with the Union to seek concurrence of the usage of this alternative."

The trial court's ruling does not appear to give adequate consideration to these specific provisions of the MOU, or to assess how these provisions reasonably should be interpreted in light of the common understanding (at the time the parties entered into the MOU) of the Governor's authority or lack of authority to impose such furloughs. (See, e.g., *Los Angeles City Employees Union v. City of El Monte* (1985) 177 Cal.App.3d 615, 623 [220 Cal.Rptr. 411] [ordinary "custom and usage" must be considered in interpreting the terms of an MOU].) In light of all of these circumstances, the trial court's reliance upon the "State's Rights" clauses in the MOU's is at the least open to serious question.

part: "If any provision of the memorandum of understanding requires the expenditure of funds, those provisions of the memorandum of understanding may not become effective unless approved by the Legislature in the annual Budget Act." Section 3517.7 follows up on the latter clause, declaring that "[i]f the Legislature does not approve or fully fund any provision of the memorandum of understanding which requires the expenditure of funds, either party may reopen negotiations on all or part of the memorandum of understanding. [¶] Nothing herein shall prevent the parties from agreeing and effecting those provisions of the memorandum of understanding which have received legislative approval or those provisions which do not require legislative action." By virtue of these provisions in the Dills Act, the Legislature retained its ultimate control (through the budget process) over expenditures of state funds required by the provisions of an MOU. (See, e.g., *Pacific Legal Foundation v. Brown, supra,* 29 Cal.3d at p. 178 ["under [section 3517.6], virtually all salary agreements are subject to prior legislative approval"].)

In the present case, by enacting appropriations for employee compensation in the *initial* 2008 Budget Act (Stats. 2008, ch. 268, enacted Sept. 2008) that were consistent with the higher level of compensation at which the employees were being paid before the furlough was implemented, the Legislature approved that level of compensation. Thus, at the time the Governor issued the December 19, 2008, executive order, the represented employees were working under a legislatively approved MOU that provided for the payment of wages without the two-day-a-month (approximately 10 percent) reduction instituted by the Governor. Accordingly, unless the MOU's specifically authorized the mandatory unpaid furlough imposed by the executive order, it would appear that *at that time* the executive order was not valid.

## VIII

For the reasons that follow, however, we conclude that on February 19 and 20, 2009, when the Legislature enacted, and the Governor then signed, legislation revising the 2008 Budget Act, the validity of the mandatory furlough program fundamentally changed. The new legislation explicitly reduced the 2008–2009 fiscal year appropriation for state employee compensation to a level reflecting the reduced compensation to be paid to employees under the Governor's furlough plan. By reducing the appropriation for employee compensation, the Legislature no longer had "fully funded" the provisions of the MOU's supporting the higher level of pay that previously had been approved, and thus, under sections 3517.6 and 3517.7, the provisions of the applicable MOU's that supported the higher level of pay the employees had been receiving prior to the implementation of the furloughs no longer were effective. (Cf. *White v. Davis, supra,* 30 Cal.4th at pp. 572–573.)

Furthermore, as we shall explain, it is reasonable to interpret language in the relevant provision of the new budget legislation as a legislative endorsement of the two-day-a-month furlough plan—as one permissible method of achieving the reduction in employee compensation mandated by the revised budget legislation, thereby validating the plan that the Governor lacked authority to impose unilaterally.

## A

As we explained above in the statement of facts (see, *ante*, at p. 1005), the legislation that revised the budget applicable to the 2008–2009 fiscal year (Sen. Bill 3X 2) effectuated a reduction in the appropriations for employee compensation by adding a provision to the 2008 Budget Act. (Sen. Bill 3X 2, § 36.)

Section 36 of Senate Bill 3X 2 provides in full:

"Section 3.90 is added to the Budget Act of 2008, to read:

"Sec. 3.90. (a) Notwithstanding any other provision of this act, each item of appropriation in this act, with the exception of those items for the California State University, the University of California, Hastings College of the Law, the Legislature (including the Legislative Counsel Bureau), and the judicial branch, shall be reduced, as appropriate, to reflect a reduction in employee compensation achieved through the collective bargaining process for represented employees or through existing administration authority and a proportionate reduction for nonrepresented employees (utilizing existing authority of the administration to adjust compensation for nonrepresented employees) in the total amounts of $385,762,000 from General Fund items and $285,196,000 from items relating to the other funds. It is the intent of the Legislature that General Fund savings of $1,024,326,000 and other fund savings of $688,375,000 in the 2009–10 fiscal year shall be achieved in the same manner described above. The Director of Finance shall allocate the necessary reduction to each item of appropriation to accomplish the employee compensation reductions required by this section.

"(b) The Department of Personnel Administration shall transmit proposed memoranda of understanding to the Legislature promptly and shall include with each such transmission estimated savings pursuant to this section of each agreement.

"(c) Nothing in this section shall change or supersede the provisions of the Ralph C. Dills Act (Chapter 10.3 (commencing with Section 3512) of Division 4 of Title 1 of the Government Code)."

As noted above (see, *ante*, at p. 1006, fn. 8), the parties disagree as to the meaning of one passage in this section—the clause providing that the reduction in employee compensation shall be "achieved through the collective bargaining process for represented employees or through existing administration authority and a proportionate reduction for nonrepresented employees (utilizing existing authority of the administration to adjust compensation for nonrepresented employees) . . . ." As we shall explain, there are actually two separate areas of disagreement with regard to this clause. We shall discuss each area of disagreement in turn.

First, SEIU and the Controller assert that by this language the Legislature directed that the reductions be achieved for represented employees only through the collective bargaining process, and that the reference to "existing administration authority" applied only to nonrepresented employees. The Governor, by contrast, maintains that under this clause "[r]eductions in employee compensation were to be achieved through the collective bargaining process for represented employees *or existing administration authority*, with a proportionate reduction for nonrepresented employees." Although the phrasing of this provision is less than precise, we conclude that the Governor's interpretation is the more reasonable.

A close reading of the specific language of this clause suggests that the first part of the clause—"achieved through the collective bargaining process for represented employees or through existing administration authority"—sets out alternative means for achieving the reductions for represented employees, whereas the second part of the clause—"and a proportionate reduction for nonrepresented employees (utilizing existing authority of the administration to adjust compensation for nonrepresented employees)"—establishes the means for achieving the reductions for nonrepresented employees. This interpretation, unlike SEIU's and the Controller's proposal, prevents the final parenthetical clause "(utilizing existing authority of the administration to adjust compensation for nonrepresented employees)" from being unnecessary and redundant.

Second, the parties also disagree as to the proper interpretation of the phrase "existing administration authority." Plaintiffs and the Controller contend that this phrase should be interpreted to permit the reductions to be achieved only through layoffs (or attrition) and not through furloughs. The Governor, by contrast, contends that the phrase should be interpreted to include the two-day-a-month furlough plan.

On its face, the phrase "existing administration authority" is ambiguous. On the one hand, the phrase could be interpreted to mean that the Legislature intended to permit the reductions in employee compensation to be achieved

through furloughs only in the event the appellate courts ultimately determined that the Governor or the DPA had the authority under existing statutes to impose furloughs unilaterally—that is, only if the appellate courts decided that the trial court correctly had concluded the existing statutory provisions granted the Governor and the DPA authority to impose furloughs without legislative concurrence. Alternatively, the term "existing administration authority," as employed in section 3.90 of the revised 2008 Budget Act, could be interpreted to mean that the Legislature intended to permit the mandated reductions in employee compensation to be achieved through the then existing furlough plan whether or not the appellate courts ultimately determined that the Governor or the DPA possessed the authority to impose furloughs unilaterally. Because, at the time the February 2009 budget legislation was enacted, the two-day-a-month furlough plan already was in existence, having been proposed and put in place—that is, authorized—by the existing gubernatorial administration, the furlough plan reasonably could be described as a means to achieve the mandated reduction in employee compensation through "existing administration authority."

As past cases establish, "if the statutory language may reasonably be given more than one interpretation, ' " ' "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." ' " ' " (*Shirk v. Vista Unified School Dist.* (2007) 42 Cal.4th 201, 211 [64 Cal.Rptr.3d 210, 164 P.3d 630]; see, e.g., *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) For a number of reasons, we conclude that the term "existing administration authority," as employed in the February 20, 2009, budget legislation, most reasonably is understood as embodying a legislative decision to permit the mandated reductions in employee compensation to be achieved through the then existing furlough plan.

First, the legislative history of the provision in question clearly and explicitly establishes that the reductions in appropriations for employee compensation that were included in the bill *reflected the two-day-a-month furloughs*. Both the Senate and the Assembly floor analyses of Senate Bill 3X 2—material that was available to the legislators at the time they were considering the budget legislation—describe in similar language the various changes that the bill would make to the 2008 Budget Act, and indicate that the source of the analyses was the author of the bill, Senator Ducheny, the chair of the Senate Budget Committee. In describing the provision in the bill relating to state employee compensation, the Senate bill analysis states: "Control Section 3.90 that reflects reductions across all budget areas to reduce employee compensation costs *related to furloughs*, the elimination of two state holidays, and minor changes to overtime calculations." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill 3X 2

(2009–2010 3d Ex. Sess.) as amended Feb. 14, 2009, p. 4, par. 22, italics added.) The comparable passage in the Assembly bill analysis states: "Reflects reductions across all budget areas to reduce employee compensation costs *related to* furlough[s], the elimination of two state holidays, and minor changes to overtime calculations." (Assem. Com. on Budget, Analysis of Sen. Bill 3X 2 (2009–2010 3d Ex. Sess.) as amended Feb. 14, 2009, p. 3, 2d par. 12, italics added.) This history makes it abundantly clear the Legislature contemplated that the reduction in appropriations for employee compensation set forth in section 3.90 could be achieved through the furlough plan that was then in existence.

Second, aside from the furlough plan, the only other available "existing administration authority" through which the state could have achieved the very substantial reduction in the appropriations for employee compensation mandated by the February 2009 budget legislation was the authority provided by section 19997, permitting a state appointing authority to "lay off" state employees "[w]henever it is necessary because of *lack of . . . funds*, or whenever it is advisable in the interests of economy, to reduce the staff of any state agency . . . ." In our view it is not reasonable to suggest that the Legislature intended *to compel* the state, in the absence of a mutually agreed-upon collective bargaining resolution, to resort to *layoffs* of a significant percentage of state employees rather than to permit the state to utilize the furlough plan that was then already in use, particularly when the legislative history makes no reference to such layoffs.

Third, although at the time the revised budget act was adopted on February 20, 2009, the trial court's judgment upholding the validity of the furlough program already had been appealed and the Legislature could not have known how the appeal ultimately would be resolved, it is reasonable to assume that body recognized that the reduction in employee compensation mandated by the revised 2008 Budget Act would have to be implemented prior to a final resolution of the appeal. We conclude that, in view of the exigent circumstances facing the Legislature, it intended to permit the then existing furlough program to be used as an alternative to other means that might be agreed upon through the collective bargaining process, without regard to whether the appellate courts ultimately determined that the Governor or the DPA possessed the authority to impose an unpaid furlough program unilaterally.

Accordingly, we conclude that the phrase "existing administration authority"—as used in section 36 of Senate Bill 3X 2—was intended to encompass the then existing furlough program. By enacting this provision, the Legislature, *through the exercise of its own legislative prerogative*, authorized the substantial reduction in the appropriations for employee

compensation, mandated in the revised budget legislation, to be achieved through the two-day-a-month furlough plan.

**B**

 Plaintiffs contend, however, that because section 3.90, subdivision (c) of the revised 2008 Budget Act (added by Sen. Bill 3X 2, § 36) provides that "[n]othing in this section shall change or supersede the provisions of the Ralph C. Dills Act . . . ," the provisions of section 3.90, subdivision (a) must be interpreted to permit the reduction in employee compensation for represented employees to be achieved *only* through the collective bargaining process and *not* alternatively through the challenged furlough program. Although, as we have discussed above, the Dills Act does not permit *the Governor or the DPA* unilaterally to impose a mandatory unpaid furlough for represented employees (in the absence of an authorizing provision in an applicable MOU, unless the parties have reached an impasse in negotiations), nothing in the Dills Act precludes *the Legislature* from adopting such a furlough plan through a legislative enactment as one method of reducing the compensation of state employees when such cuts are found necessary and appropriate in light of the state's fiscal condition. (See, e.g., *Greene, supra*, 5 Cal.App.4th 155, 186–193 [upholding application of budget-related statute that, as interpreted, permitted the DPA unilaterally to implement its final offer regarding reductions in the state employer's contributions to represented employees' health care premiums]; *Stationary Engineers Local 39* (2009) PERB Dec. No. 2085-S [34 PERC ¶ 24, p. 97] ["We find nothing in the language or legislative history of [section 3517.8] to indicate the Legislature intended to limit its authority to legislate changes in terms and conditions of employment during the period when DPA is bargaining with a recognized employee organization following the expiration of an MOU."]; *AFSCME Local 2620* (2008) PERB Dec. No. 1978-S [32 PERC ¶ 148, p. 577] ["The Dills Act . . . does not preclude the Legislature itself from unilaterally adopting, enacting or implementing terms and conditions of employment which, if implemented by DPA without legislative direction, would have been an unfair practice if not negotiated."].) If, as we have concluded, the Legislature agreed to permit the reduction in the appropriations for employee compensation embodied in the revised 2008 Budget Act to be achieved either through the collective bargaining process or through the two-day-a-month furlough plan, the adoption of such a legislative provision did not operate to change or supersede the provisions of the Dills Act.[36]

---

[36] On or about February 24, 2009, the DPA and SEIU (one of the plaintiffs in this litigation) reached agreement upon new MOU's (covering the period from July 1, 2008, to June 30, 2010) for numerous bargaining units represented by SEIU. (See, e.g., Bargaining Unit 1 (SEIU, Local 1000) Tentative Agreement 07-01-2008 to 06-30-2010 <http://www.dpa.ca.gov/bargaining/contracts/index.htm> [as of Oct. 4, 2010].) A provision included in the new MOU's

## C

Plaintiffs further contend that even if the provisions of section 3.90, subdivision (a) of the revised 2008 Budget Act are interpreted to authorize the use of the furlough plan as one permissible alternative means of achieving the reduction in employee compensation mandated by that section, the Legislature was prohibited by the "single subject" rule embodied in article IV, section 9 of the California Constitution from enacting such a proposal as part of the budget act itself, and could do so only through passage of a separate "trailer bill" or some other independently enacted legislative measure. We disagree.

Prior decisions have stated that " ' " 'the budget bill may deal only with the one subject of appropriations to support the annual budget,' " and thus " 'may not constitutionally be used to grant authority to a state agency that the agency does not otherwise possess' " or to ' "substantively amend[] and chang[e] [e]xisting statute law.' " ' " (*Planned Parenthood Affiliates v. Swoap* (1985) 173 Cal.App.3d 1187, 1191 [219 Cal.Rptr. 664] (*Planned Parenthood*) [quoting *Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 394 [211 Cal.Rptr. 758, 696 P.2d 150], which in turn was quoting 64 Ops.Cal.Atty.Gen. 910, 917 (1981)].) Section 3.90, however, unlike the budget act provisions at issue in *Planned Parenthood* and a number of other cases (see, e.g., *Planned Parenthood, supra*, 173 Cal.App.3d 1187, 1191, fn. 1; *California Lab. Federation v. Occupational Safety & Health Stds. Bd.* (1992) 5 Cal.App.4th 985, 991, fn. 4 [7 Cal.Rptr.2d 399]; *Homen v. Gomez* (1995) 37 Cal.App.4th 597, 599–600 [43 Cal.Rptr.2d 647]), does not substantively amend or change any existing statutory provision or expand or restrict the substantive authority

---

(entitled "New Mandatory Personal Furlough Leave Program") would have reduced the number of mandatory unpaid furlough days for employees covered by the agreements to one day a month.

The furlough provision included in the new SEIU MOU's did not take effect immediately, because the proposed reduction of furlough days required the expenditure of funds for which no appropriation had been made by the Legislature. (See § 3517.6, subd. (b).) A bill that would provide legislative approval of the new SEIU MOU's was introduced in the Assembly on February 26, 2009, and was amended on March 23, 2009, to refer explicitly to the furlough program contained in the MOU's. (Assem. Bill No. 964 (2009–2010 Sess.) §§ 5, 6 (Assembly Bill 964).) That bill proposed to appropriate more than $9.4 million to augment the appropriation for state employee compensation for the 2008–2009 fiscal year. (Assem. Bill 964, § 7.) On May 4, 2009, however, Assembly Bill 964, as amended on March 23, 2009, failed to obtain the two-thirds affirmative vote necessary for passage.

The proposed legislation seeking approval of the new SEIU MOU's demonstrates that any solution to the reduction in appropriations for employee compensation contained within the revised 2008 Budget Act and the 2009 Budget Act arrived at through the collective bargaining process, and providing treatment for represented employees more favorable than that afforded by the two-day-a-month furlough plan, would become effective only if new legislation, appropriating additional funds for such purposes, were enacted into law.

of any state agency, and cannot reasonably be described as a substantive policy change "masquerading as [a] Budget Act provision[]." (*California Lab. Federation, supra*, 5 Cal.App.4th at p. 996.)[37]

In particular, section 3.90 of the revised 2008 Budget Act does not alter the provisions of Government Code section 19826 or purport to grant the Governor or the DPA authority to impose unpaid furloughs *unilaterally*, but rather embodies the Legislature's determination that the two-day-a-month furlough plan is a permissible means by which the specific reductions set forth in section 3.90 may be implemented.[38] Section 19826 places no

---

[37] In *Planned Parenthood, supra*, 173 Cal.App.3d 1187, the budget act provision at issue effectively amended existing statutes to prohibit the state Office of Family Planning from making state funds available to any clinic " 'which performs, promotes, or advertises abortions . . . .' " (*Id.*, at p. 1191, fn. 1.) In *California Lab. Federation v. Occupational Safety & Health Stds. Bd., supra*, 5 Cal.App.4th 985, the budget act provision amended the private attorney general fee statute (Code Civ. Proc., § 1021.5) to limit the amount that could be recovered under that statute from state agencies. In *Homen v. Gomez, supra*, 37 Cal.App.4th 597, the budget act provision amended the existing prison visitation policy to prohibit family visitation by persons convicted of specified crimes. (See also *Association for Retarded Citizens v. Department of Developmental Services, supra*, 38 Cal.3d at pp. 391–394 [court declined to interpret budget act provision in a manner that (1) would have reduced the services that developmentally disabled persons had a right to receive at state expense under the preexisting Lanterman Developmental Disabilities Services Act (Welf. & Inst. Code, §§ 4500–4846), and (2) would have fundamentally altered the respective responsibilities of the State Department of Developmental Services and of local regional centers under this legislation; the court explained that such an interpretation of the budget act provision would raise serious constitutional questions under the single subject rule].)

[38] Other legislation, enacted at the same time as part of the February 2009 budget package, makes it quite clear that the Legislature did not intend to grant the Governor or other executive officials ongoing authority, even in a fiscal emergency, to reduce appropriations for employee compensation that had been agreed to in an MOU.

In September 2008, as part of an earlier budget package, the Legislature added a new provision, section 13312, to the Government Code. That statute, as originally enacted, provided that, commencing with the 2008–2009 fiscal year, if, after the annual budget act was enacted, the Director of Finance determined that the fiscal year budget was likely to be substantially out of balance, the Director of Finance could reduce General Fund items of appropriations, subject to a number of conditions and exceptions set forth in the provision. (Stats. 2008, ch. 751, § 33, eff. Sept. 30, 2008.) As part of the budget package adopted in February 2009, the Legislature amended section 13312, adding, as an additional category of appropriations that the Director of Finance was *not* permitted to reduce under the provision, appropriations for "[a]ny collective bargaining agreement with a recognized state employee organization." (§ 13312, subd. (b)(1)(I), enacted by Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 4, § 2, eff. Feb. 20, 2009.) Thus, although the Legislature was willing, as part of the comprehensive budget package enacted in February 2009, to afford the Director of Finance some ongoing authority to reduce appropriations in order to deal with a developing midyear budget deficit, the Legislature was unwilling, even in such circumstances, to grant unilateral authority to this official to reduce the agreed-upon employee compensation embodied in an MOU.

Although the amended version of section 13312 was enacted, and was signed into law, on February 20, 2009, that statute never became operative. As amended, section 13312 specified that it would become operative only if one of the constitutional amendments that was to be

limitation upon *the Legislature's authority* to increase or reduce the pay or salaries of state employees, and section 3.90 simply represents an exercise of the Legislature's reserved authority over state-employee compensation. Past budget acts have included similar provisions directing that an increase in appropriations for employee compensation set forth in the budget act be implemented in a particular manner specified by the Legislature, even when the DPA or its predecessor (the State Personnel Board) would not have had authority to make those particular salary adjustments itself under the existing statutory provisions (see *Pacific Legal Foundation v. Brown, supra*, 29 Cal.3d at pp. 190–191 & fns. 13–14 [citing budget provisions]),[39] and those budget act provisions never have been viewed as violating the single subject rule.

The Legislature's use of the term "existing administration authority" to encompass the existing furlough plan as a permissible means of budget reduction is not inconsistent with our conclusion that the Governor and the DPA lacked authority to impose such furloughs under the existing general statutory provisions. As explained above, the context in which section 3.90 was adopted makes plain the Legislature's intent to authorize the furlough plan whether or not the Governor's or the DPA's unilateral authority to impose furloughs ultimately was vindicated on appeal. The Legislature exercised its own authority to ratify furloughs, and did not need to expand or modify preexisting executive authority in order to do so. Moreover, to the extent the language of section 3.90 is ambiguous in this regard, our decision in *Association for Retarded Citizens v. Department of Developmental Services, supra*, 38 Cal.3d at page 394, demonstrates that this provision should not be interpreted to expand or modify the Governor's or the DPA's authority, under preexisting statutes, in a manner that would raise constitutional questions under the single subject rule.

We conclude that the budget act provision here at issue concerns only " ' " 'the one subject of appropriations to support the annual budget' " ' " (*Planned Parenthood, supra*, 173 Cal.App.3d at p. 1199) and not more than one subject.

---

placed on the ballot in an upcoming special statewide election was approved by the voters. (See § 13312, subd. (g).) At the special election held on May 19, 2009, the proposed constitutional amendment was rejected by the voters, and thus section 13312 never became operative.

[39] For example, in 1969 a budget act provision specified that "special inequity salary adjustments" for that budget year were to be conferred only upon those employees who were in occupational groups that were earning 7 percent or more below the prevailing data and whose monthly salary did not exceed $950 (Stats. 1969, ch. 355, item 297.1, pp. 784–785), and in 1976 the budget act prescribed a $70-per-month salary increase for all state employees other than those employed by the California Highway Patrol (who were provided a $120-per-month increase). (Stats. 1976, ch. 341, § 15, p. 938.)

## D

Accordingly, we conclude that the provisions of section 3.90, added by the revised 2008 Budget Act in February 2009, authorized the state to implement the reduction in employee compensation mandated by that section through the two-day-a-month unpaid furlough program that already had been implemented at the direction of the Governor.

## IX

Although, for the reasons discussed above, we disagree with much of the trial court's reasoning, in light of the legislative measures enacted after the trial court's ruling we conclude that plaintiffs are not entitled to the relief sought in this litigation. Accordingly, the judgment rendered by the trial court, denying the relief sought in these mandate proceedings, is affirmed. The parties shall bear their own costs on appeal.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**CORRIGAN, J.,** Concurring.—I concur. I am in full agreement with the conclusion that the Legislature endorsed the Governor's furlough plan in the budget legislation at issue. I also agree that, by reducing the appropriation for employee compensation, the Legislature rendered ineffective the pay provisions in the expired memoranda of understanding, which had been extended by statute. (Gov. Code, §§ 3517.6, subd. (b), 3517.8, subd. (a).)[1] I take a slightly different view, however, on the meaning of "existing administration authority" in section 3.90, subdivision (a) of the revised 2008 Budget Act. (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 2, § 36, adding § 3.90 to the original 2008 Budget Act (Stats. 2008, ch. 268).) (See maj. opn., *ante*, at p. 1005.) Furthermore, I do not agree that section 19826, subdivision (b) bars the Department of Personnel Administration (DPA) from implementing furloughs. If it did, we would have a single-subject problem. The Legislature has retained considerable authority over matters of state employee compensation, but it is not free to disregard statutory restrictions and grant agencies new authority in a budget bill.

As explained in the majority opinion, it is clear from the context of the budget negotiations at the end of 2008 and the beginning of 2009 that the Legislature adopted the savings realized by the Governor's furlough plan. But it is important to note that when it took this action, the Legislature did not create new administrative authority out of whole cloth, or rely entirely on an executive order that was without legal support. DPA has statutory jurisdiction—i.e., "existing administration authority"—over the salaries and hours of

---

[1] Further statutory references are to the Government Code.

state employees. (§§ 19816, subd. (a), 19849; *Gilb v. Chiang* (2010) 186 Cal.App.4th 444, 465 [111 Cal.Rptr.3d 822]; *Tirapelle v. Davis* (1993) 20 Cal.App.4th 1317, 1322 [26 Cal.Rptr.2d 666].) For reasons stated in the majority opinion, the executive branch lacks *unilateral* authority to implement furloughs. However, when the Legislature authorized the furlough program, it did not enlarge DPA's administrative functions. This is significant, because the single-subject rule requires that a budget bill deal only with the one subject of appropriations to support the annual budget. It may not constitutionally grant authority to a state agency that the agency does not otherwise possess, or amend existing statutory law.[2] (*Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 394 [211 Cal.Rptr. 758, 696 P.2d 150]; *California Lab. Federation v. Occupational Safety & Health Stds. Bd.* (1992) 5 Cal.App.4th 985, 991 [7 Cal.Rptr.2d 399]; *Planned Parenthood Affiliates v. Swoap* (1985) 173 Cal.App.3d 1187, 1199 [219 Cal.Rptr. 664]; see also *Homan v. Gomez* (1995) 37 Cal.App.4th 597, 599–600 [43 Cal.Rptr.2d 647].)

The majority holds that the trial court erred when it ruled that the furlough plan did not implicate section 19826, subdivision (b), which provides that DPA "shall not establish, adjust, or recommend a salary range for any employees" represented by a union. However, if this statute prohibits the salary adjustments resulting from furloughs, then by removing that prohibition section 3.90 would indeed grant authority to DPA that it did not otherwise possess and would change existing statutory law, in violation of the single-subject rule as framed in the cases cited above. I am not persuaded by the majority's declaration that existing statutes place no limitation on the Legislature's reserved authority over state employee compensation. The single-subject rule says otherwise. Just as the Legislature was not free to disregard the statutes governing services for the developmentally disabled in *Association for Retarded Citizens v. Department of Developmental Services, supra,* 38 Cal.3d 384, it was not free in this case to disregard the statutes governing employee compensation. The Legislature's authority to reduce appropriations for employee compensation is broad, but its authority to create new programs like the furlough plan is subject to existing statutory restrictions.

In my view, the trial court reached the correct conclusion on the applicability of section 19826, subdivision (b). This statute is concerned with salary *ranges*, and furloughs do not affect ranges. The ranges remain in place, and salaries return to their ordinary levels when the furlough program expires.

---

[2] This does not mean agencies cannot gain the authority to take action in their sphere of operations as a result of budget provisions; of course that is a routine effect of appropriations or reductions in spending. It does mean that the Legislature cannot enlarge the scope of agency authority in a budget bill.

Certainly, furloughed employees consider the ordinary levels to represent their true salaries. Employees hired during a furlough period would not be informed that their salary was the reduced amount resulting from furloughs. Rather, they would naturally be told, and would understand, that their salary was the higher amount that would normally be paid. While furloughs result, as a practical matter, in a temporary salary reduction, they are not the same thing as the 5 percent salary cuts that the *Greene* court deemed a violation of section 19826, subdivision (b). (*Department of Personnel Administration v. Superior Court (Greene)* (1992) 5 Cal.App.4th 155, 174 [6 Cal.Rptr.2d 714].) Under the furlough program, salaries remain the same for purposes of benefits calculations, and indeed for determining the amount of paychecks in accordance with the reduction in hours worked. Accordingly, I would hold that section 19826, subdivision (b)'s bar against adjustment of salary ranges does not apply to furloughs.

For the reasons stated above, I concur in the result reached by the majority opinion.